UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

MIGUEL FRANCISCO MORA NUNEZ
and CHRISTHIAN AYBAR-BERROA,

Defendants.

S1 25 Cr. 367 (LAP)

**MEMORANDUM OF LAW IN SUPPORT OF CHRISTHIAN AYBAR-BERROA'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

FEDERAL DEFENDERS OF NEW YORK, INC.
Neil P. Kelly
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700
neil_kelly@fd.org

*Counsel for Christhian Aybar-Berroa*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................ i

INTRODUCTION ........................................ 1

BACKGROUND ........................................ 2

ARGUMENT ........................................ 3

I. The Second Amendment's Plain Text Covers The Charged Conduct ........................................ 6

II. Section 922(g)(5)(A) Is Unconstitutional under Bruen ........................................ 12

A. There is no "distinctly similar" historical tradition of disarming aliens ........................................ 14

B. There are no "relevantly similar" historical analogues to disarming aliens ........................................ 16

1. History and tradition reveal no analogues relevantly similar to Section 922(g)(5)(A) ........................................ 16

2. Oath and allegiance laws and 18 U.S.C. § 922(g)(5) are similar only in that they are premised on the impermissibly vague notion of presumptive "untrustworthiness" ........................................ 21

CONCLUSION ........................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**


*Arizona v. United States*,
567 U.S. 387 (2012) .......... 22

*Bridges v. Wixon*,
326 U.S. 135 .......... 6, 10

*Cotzojay v. Holder*,
725 F.3d 172 (2d Cir. 2013) .......... 9, 10

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... *passim*

*Dred Scott v. Sanford*,
60 U.S. 393 (1857) .......... 11

*IBP, Inc. v. Alvarez*,
546 U.S. 21 (2005) .......... 9

*INS v. Lopez-Mendoza*,
468 U.S. 1032 (1984) .......... 6, 9

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) .......... 18

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .......... 12

*Millan-Hernandez v. Barr*,
965 F.3d 140 (2d Cir. 2020) .......... 10

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
597 U.S. 1 (2022) .......... *passim*

*Oliver v. United States*,
446 U.S. 170 (1984) .......... 7

*Patsone v. Pennsylvania*,
232 U.S. 138 (1914) .......... 15

*Plyler v. Doe*,
457 U.S. 202 (1982) .......... 8, 11

*Rodriguez v. Barr*,
943 F.3d 134 (2d Cir. 2019) .......... 10

*Turkmen v. Hasty*,
789 F.3d 218 (2d Cir. 2015) ........................................ 10

*United States v. Bass*,
404 U.S. 336 (1971)........................................22

*United States v. Carbajal-Flores*,
143 F.4th 877 (7th Cir. 2025) ........................................ *passim*

*United States v. Jimenez*,
895 F.3d 228 (2d Cir. 2018) ........................................ 5, 8

*United States v. Jimenez-Shilon*,
34 F.4th 1042 (11th Cir. 2022) ........................................ 17

*United States v. Meza-Rodriguez*
798 F.3d 664 (7th Cir. 2015) ........................................ 11, 12, 14, 22

*United States v. Perez*,
6 F.4th 448 (2d Cir. 2021) ........................................ 4, 5, 8

*United States v. Pierret-Mercedes*,
731 F. Supp. 3d 284 (D.P.R. 2024) ........................................ 17

*United States v. Portillo-Munoz*,
643 F.3d 437 (5th Cir. 2011) ........................................ 11

*United States v. Rahimi*,
602 U.S. 680 (2024) ........................................ *passim*

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) ........................................ 5, 8, 9, 10

*Wong Wing v. United States*,
163 U.S. 228 (1896) ........................................ 6

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ........................................ 7

*Zherka v. Bondi*,
140 F.4th 68 (2d Cir. 2025) ........................................ 5, 16

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ........................................ 10

**STATUTES**

18 U.S.C. § 3 ........................................ 3

18 U.S.C. § 922(g)(5) ........................................ *passim*

18 U.S.C. § 922(g)(6) .......... 5

18 U.S.C. § 922(g)(8) .......... 5

18 U.S.C. § 924(a)(8) .......... 16

**REGULATIONS**

8 C.F.R. § 245.1(d) .......... 7

**RULES**

Federal Rule of Criminal Procedure 12(b) .......... 1

**OTHER AUTHORITIES**

William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1765) .......... 8

Patrick R. Charles, *The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: An Historical Perspective*, 15 TEX. REV. L. & POL. 61 (2010) .......... 17

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139 (2007) .......... 19

Jonathan Elliot, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION (2d ed. 1836), .......... 9

Pratheepan Gulasekaram, *The Second Amendment's "People" Problem*, 76 VAND. L. REV. 1437 (2023) .......... 12

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1983) .......... 17

Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. REV. 667 (2003) .......... 11

Abby Vorhees, *The Constitutionality of Barring Undocumented Immigrants from Second Amendment Protections,* 73 AM. U. L. REV. 929 (2024) .......... 20

Christhian Aybar-Berroa, through his undersigned counsel, respectfully submits this memorandum of law in support of his motion to dismiss the Superseding Indictment pursuant to the Second Amendment to the United States Constitution, Federal Rule of Criminal Procedure 12(b), and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

## INTRODUCTION

The Second Amendment guarantees an individual's right to bear arms for self-defense, both in one's home and publicly. In *Bruen*, the Supreme Court announced that, to justify any restriction on this fundamental constitutional right, the government must show such restriction is "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 34–37.

Section 922(g)(5)(A) of Title 18 of the United States Code, which criminalizes the possession of a firearm or ammunition by an alien who "is illegally or unlawfully in the United States," does not satisfy this standard. Aliens without formal status, illegally or unlawfully present in the United States, are among "the people" whose rights are guaranteed by the plain text of the Second Amendment, and the standard issue ammunition at issue in this case is encompassed under the Amendment's protection of "arms." Thus, it is presumptively lawful for a status-less alien to "keep and bear arms" unless the government can prove section 922(g)(5)(A) is consistent with this Nation's history and tradition of firearm regulation. It cannot. There is no distinctly similar historical tradition of disarming aliens. Nor is there any relevantly similar historical tradition that burdens the Second Amendment right as section 922(g)(5)(A) does.

For these reasons, section 922(g)(5)(A) is unconstitutional. Accordingly, the Superseding Indictment in this case, which charges Mr. Aybar-Berroa with violating section 922(g)(5)(A) and with being an accessory after the fact to Mr. Mora Nunez's violation of the same statute, must be dismissed.

**BACKGROUND**

Just before midnight on July 19, 2025, two individuals who were sitting in a secluded area in Fort Washington Park in Manhattan were approached by a person who was riding through the park as a passenger on the back of a motorbike.[1] This person got off the motorbike and walked toward the two individuals sitting by the river. As this person approached, gunfire was exchanged between one of the individuals sitting in the park (an off-duty Customs and Border Patrol ("CBP") officer) and the person who got off the motorbike. After this exchange, the person who had gotten off the motorbike, who appeared to have been struck by the officer's shots, got back on and was driven by the operator of the motorbike away from the scene.

Shortly after midnight, Miguel Francisco Mora Nunez was admitted to a hospital in the Bronx with multiple gunshot wounds. The government alleges that Mr. Mora Nunez was the person who approached the two individuals in the park and that Mr. Aybar-Berroa was the operator of the motorbike who drove him away after the shooting.

The New York City Police Department arrested Mr. Mora Nunez on July 20, 2025 at the hospital in connection with unrelated probable cause "I-Cards" and an out of state warrant. Mr. Mora Nunez was charged criminally by complaint on July 23, 2025 with violating section 922(g)(5)(A). The government alleges that he entered the United States without permission in April 2023, was charged as removeable from the United States under the Immigration and Nationality Act ("INA"), did not appear as directed at his immigration proceedings, and was subject to an order of removal. The government further alleges that Mr. Mora Nunez exchanged gunfire with the CBP officer in the park, that two pieces of .380 caliber ammunition were

---

[1] The facts as alleged by the government are accepted as true for purposes of this motion to dismiss. *See United States v. Kerik*, 615 F. Supp. 2d 256, 260 (S.D.N.Y. 2009).

recovered from the scene of the shooting, and that this ammunition could not have come from the CBP officer's firearm.

At approximately 3:00 a.m. on July 21, 2025, Mr. Aybar-Berroa, a native of the Dominican Republic, was arrested in Queens, New York by federal agents for alleged immigration law violations. The government asserts that he entered the United States without permission in June 2022, was charged as removable under the INA, did not appear as directed at his immigration proceedings, and was subject to an order of removal. On July 23, 2025, Mr. Aybar-Berroa was charged by complaint with being an accessory after the fact to Mr. Mora Nunez's unlawful possession of the ammunition recovered from the scene of the shooting, with the government alleging that he gave the clothing he was wearing, which had Mr. Mora Nunez's blood on it, to a relative of Mr. Mora Nunez to hide this evidence.

On August 13, 2025, an indictment was unsealed that charged Mr. Mora Nunez with unlawfully possessing ammunition as an alien illegally and unlawfully in the United States in violation of 18 U.S.C. § 922(g)(5)(A) and charged Mr. Aybar-Berroa with being an accessory after the fact to Mr. Mora Nunez's underlying offense in violation of 18 U.S.C. § 3. On November 13, 2025, the Superseding Indictment was unsealed, which contained the same charges and also charged Mr. Aybar-Berroa with the substantive offense of violating section 922(g)(5)(A) based on the government's allegation that the same ammunition possessed by Mr. Mora Nunez was located at Mr. Aybar-Berroa's residence.

## ARGUMENT

Adopted in 1791, the Second Amendment provides that "the right of the people to keep and bear Arms [ ] shall not be infringed." U.S. Const. amend. II. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Dist. of Colum. v. Heller*, 554 U.S. 570, 592 (2008). This enumerated right is as important and deserving

of protection as all enumerated constitutional rights, which "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35.

In 2022, the Supreme Court held that Second Amendment protections include "an individual's right to carry a handgun for self-defense outside the home," and provided guidance on how courts should determine whether firearms regulations impermissibly infringe on this right and violate the Constitution. *See Bruen*, 597 U.S. at 10. In doing do, the Court invalidated the framework for adjudicating Second Amendment challenges, known as "means-end scrutiny," that the Second Circuit and other courts had previously employed. *Id.* at 17–19. In *Bruen*, the Supreme Court explained that "the standard for applying the Second Amendment is as follows":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command. *Id.* at 17 (quotations omitted).

The burden is squarely on the government: it must "affirmatively" prove that a challenged law is supported by "historical precedent" that "evinces a comparable tradition of regulation." *Id.* at 19, 27; *see also United States v. Rahimi*, 602 U.S. 680, 692, 701 (2024) (holding that the law at issue must be "relevantly similar" to "laws that our tradition is understood to permit"). The Court is "not obliged to sift the historical materials for evidence . . . . That is [the government's] burden." *Bruen*, 597 U.S. at 60.

The Second Circuit has yet to address the constitutionality of section 922(g)(5) following *Bruen*. There is no dispute that *Bruen* abrogated the Circuit's prior decision in *United States v. Perez*, 6 F.4th 448 (2d Cir. 2021), which employed the now prohibited "means-end scrutiny" to uphold section 922(g)(5) in the face of a Second Amendment challenge. *See Bruen*, 597 U.S. at

19; *Perez*, 6 F.4th at 453–56. Nor is there an argument that the Circuit's decision in *Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025), which upheld felon disarmament under 18 U.S.C. § 922(g)(1) against a *Bruen* challenge, controls. Similarly, the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. 680 (2024), which upheld 18 U.S.C. § 922(g)(8)'s prohibition on firearm possession by individuals subject to a domestic violence restraining order, does not preclude this motion. Because the question of section 922(g)(5)'s constitutionality is an open question in this Circuit post-*Bruen*, the Court should apply the "straightforward" two-step framework the Supreme Court has laid out for challenges to firearms regulations under the Second Amendment. *See* 597 U.S. at 26.

Following this analysis, the Court should conclude that, like the First, Fourth, Ninth, and Tenth Amendments, the plain text of the Second Amendment protects status-less aliens, because they are among "the people" whose rights the Amendment guarantees. *See Heller*, 554 U.S. at 580 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)). The Second Amendment reaches the alleged conduct because it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *cf. United States v. Jimenez*, 895 F.3d 228 (2d Cir. 2018) (finding no analytical distinction between "firearms" and "ammunition" for purposes of pre-*Bruen* challenge to constitutionality of 18 U.S.C. § 922(g)(6)).

Because the plain text of the Second Amendment applies, section 922(g)(5)(A) is presumptively unconstitutional. *Bruen*, 597 U.S. at 18. To defeat this presumption, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right." *Id.* at 19. While the government need not

find a "historical twin," it bears the burden of showing that its regulation is "analogous enough to pass constitutional muster." *Id*. at 30. It cannot. The Superseding Indictment must be dismissed.

## I. The Second Amendment's Plain Text Covers The Charged Conduct

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. Here, Messrs. Mora Nunez and Aybar-Berroa and their alleged conduct fall squarely within the Second Amendment's plain text. Both defendants are members of the "people" protected by the Second Amendment, and the standard issue ammunition they are accused of possessing is within the scope of "arms" to which the Second Amendment indisputably applies. *See Heller*, 554 U.S. at 628 (holding Washington D.C.'s handgun ban was "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for" the lawful purpose of self-defense).

"The people" as used in the Second Amendment "unambiguously refers to all members of the political community." *Heller*, 554 U.S. at 580. This includes aliens living "illegally or unlawfully in the United States," 18 U.S.C. § 922(g)(5)(A), because the Second Amendment's text excludes no one from "the people."[2] The Supreme Court has repeatedly held that the Bill of Rights applies to individuals unlawfully present in the country. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945 (recognizing that aliens have First Amendment rights); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1046 (1984) (recognizing that aliens have Fourth Amendment rights); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (holding that "all persons within the territory of the United States are entitled to the protection" of the Fifth and Sixth Amendments);

---

[2] For the purposes of this facial challenge, this motion assumes without conceding that Mr. Mora Nunez and Mr. Aybar-Berroa were unlawfully present in the United States. The government bears the burden of ultimately proving that each individual was unlawfully or illegally present in the United States.

*Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (holding that all persons within the United States are protected by the Fourteenth Amendment). Thus, "the people" whose rights are guaranteed by the First and Fourth Amendments are the same as those protected by the Second Amendment.[3] *See Heller*, 554 U.S. at 580 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right."). Because none of these amendments distinguishes between citizens, non-citizen residents, or those lacking lawful immigration status, it would be inappropriate to read into the Constitutional text a limiting provision that does not exist.[4] *See Bruen*, 597 U.S. at 18 (noting the Second Amendment's "unqualified command"). Aliens without formal status are therefore among "the people" protected by the Second Amendment.

The Second Circuit has twice held that aliens are among "the people" for purposes of the Second Amendment. As announced in *Heller*, "'the people' is a 'term of art employed in select parts of the Constitution' that 'refers to a class of persons who are part of a national community

---

[3] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of *the people* peaceably to assemble." U.S. Const. amend. I (emphasis added). The Second Amendment provides that "the right of *the people* to keep and bear Arms shall not be infringed." U.S. Const. amend. II (emphasis added). The Fourth Amendment provides that "the right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV (emphasis added).

[4] This is especially true for an administrative term like "lawful immigration status." 8 C.F.R. § 245.1(d)(1). The meaning of "the people" does not yield to administrative classifications of residents. *See Oliver v. United States*, 446 U.S. 170, 186–87 (1984) (Marshall J., dissenting) ("The Fourth Amendment, like the other central provisions of the Bill of Rights . . . , was designed, not to prescribe with 'precision' permissible and impermissible activities, but to identify a fundamental human liberty that should be shielded forever from government intrusion. We do not construe constitutional provisions of this sort the way we do statutes. . . . Rather, we strive, when interpreting these seminal constitutional provisions, to effectuate their purposes—to lend them meanings that ensure that the liberties the Framers sought to protect are not undermined by the changing activities of government officials." (citing *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819) (footnotes omitted)).

or who have otherwise developed sufficient connection with this country to be considered part of that community.'" 554 U.S. at 580 (quoting *Verdugo-Urquidez*, 494 U.S. at 265). Following this precedent, the Circuit concluded "at least some non-citizens are covered by the Second Amendment." *United States v. Jimenez*, 895 F.3d 228, 233 n.1 (2d Cir. 2018). In 2021, the Circuit affirmed that *Jimenez* properly "concluded that, '[a]lthough the [*Heller*] Court uses 'citizens,' presumably at least some non-citizens are covered by the Second Amendment.'" *Perez*, 6 F.4th at 451–52 (footnotes omitted).[5] As *Perez* explained, to draw lines between "the people" and "person" as the latter is used in the Fifth and Fourteenth Amendments would "introduce difficult questions into our jurisprudence" considering the latter amendments have "long been recognized" to include unlawful aliens. *Id.* at 452 (citing *Plyler v. Doe*, 457 U.S. 202, 210 (1982)). The Second Circuit's "practice in [such] cases has been to assume that a given firearm restriction implicates rights guaranteed by the Second Amendment." *Id*. at 453.

That "the people" includes those residing in the United States without citizenship or other lawful status follows from the Constitution's text. The term "the people" is broader than "citizens." The Constitution's text shows that when the Framers meant to limit a provision's application to citizens, they did so expressly. *See, e.g.*, U.S. Const. art. I, § 2, cl. 2 (right to hold office in House of Representatives); *id*. art. I, § 3, cl. 3 (same, Senate); *id*. art. II, § 1, cl. 5 (same, Presidency); *id*. art. IV, § 2, cl. 1 (Privileges and Immunities clause). If the Framers meant to limit the right to keep and bear arms to citizens, the Second Amendment would use that word. *Cf.* 1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 366 (1765) (considering "such persons as fall under the denomination of the *people*" to include "aliens and

---

[5] In *Perez*, the Circuit avoided definitively resolving whether an undocumented immigrant living in the United States was such a covered non-citizen, by assuming he was and resolving the case using now-overruled means-ends analysis. *See* 6 F.4th at 452.

natural-born subjects," but observing that the groups held different sets of rights); *see* 4 Jonathan Elliot, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 556 (2d ed. 1836) (statement of James Madison suggesting some "aliens" are entitled to the "protection and advantage" of the Constitution).

"The people" whose rights are guaranteed by the First and Fourth Amendments include noncitizens residing unlawfully in this country. Just as "the people" applies to aliens in the First and Fourth Amendments, so too does it retain that meaning for the Second Amendment. The term should be interpreted consistently throughout the Bill of Rights because identical words used in different parts of the same document are to be construed identically. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).

"[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike," including aliens who do not have lawful immigration status. *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) (finding that an egregious Fourth Amendment violation against an unlawfully present noncitizen warranted a suppression hearing). In *I.N.S. v. Lopez-Mendoza*, the Supreme Court addressed two noncitizens illegally in the country who moved for suppression in a civil deportation proceeding. *See* 468 U.S. at 1034–35. The Court reversed, in part, the lower court's holding that the exclusionary rule applied in a deportation proceeding. *Id*. at 1050–51. But it did not disturb the lower court's holding that the noncitizens' Fourth Amendment rights were violated in the first place. *Id*. at 1038. Subsequently, in *Verdugo-Urquidez*, the Supreme Court held that a Mexican national who was arrested in Mexico and then brought to this country for prosecution could not complain that federal agents violated the Fourth Amendment when they searched his Mexican residence without a warrant. *See* 494 U.S. at 274–75. Distinguishing the defendant there from the unauthorized noncitizens in *Lopez-Mendoza*, the Court explained that

the aliens in the earlier case "were in the United States voluntarily and presumably had accepted some societal obligations." *Verdugo-Urquidez*, 494 U.S. at 273. It was taken as established that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271.

Since *Verdugo-Urquidez*, the Second Circuit has ordered suppression hearings in immigration proceedings for undocumented noncitizens who made an adequate showing of egregious Fourth Amendment violations. *See Cotzojay*, 725 F.3d at 183; *Millan-Hernandez v. Barr*, 965 F.3d 140, 149 (2d Cir. 2020); *Rodriguez v. Barr*, 943 F.3d 134, 143 (2d Cir. 2019). Similarly, the Circuit has held that out-of-status noncitizen detainees stated a plausible Fourth Amendment claim for unreasonable strip searches in the wake of 9/11 detention policies. *See Turkmen v. Hasty*, 789 F.3d 218, 224, 261 (2d Cir. 2015), *judgment rev'd in part, vacated in part on other grounds, sub nom. Ziglar v. Abbasi*, 582 U.S. 120 (2017). The noncitizens with Fourth Amendment rights in *Cotzojay*, *Millan-Hernandez*, and *Turkmen* all lived in the United States. That distinguishes them from the noncitizen brought to the United States in *Verdugo-Urquidez* and makes them similar to aliens voluntarily living in the United States, such as Messrs. Mora Nunez and Aybar-Berroa.

Under the First Amendment, "[f]reedom of speech and of press is accorded aliens residing in this country," as is freedom of association and the right to petition. *Bridges*, 326 U.S. at 148; *see also* Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. REV. 667, 680–711 (2003) (showing that "the people" was well understood during the Founding Era to include immigrants with respect to the right to petition). "The people" accorded these rights include aliens who are unlawfully present in the United States. In *Ragbir v. Homan*, for example, the Second Circuit considered a suit brought by a noncitizen subject to a valid final order of

removal who sought to enjoin his deportation because he claimed it was in retaliation for his public advocacy against ICE policies, in violation of his First Amendment rights. 923 F.3d 53, 57 (2d Cir. 2019), *vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020). The Court held that the unlawfully present, post-final-order noncitizen stated a cognizable First Amendment claim and even noted that his speech "implicate[d] the apex of protection under the First Amendment" because of its political nature. *Id*. at 69, 78–79.

The Supreme Court's decision in *Plyler v. Doe* further confirms that the Second Amendment applies to aliens regardless of their immigration status. *See* 457 U.S. 202. The Court held that unauthorized aliens are "persons" within the meaning of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments: "Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Id*. at 210. If unauthorized aliens are constitutional "persons," as *Plyler* held, they are part of the constitutional "people" as well. "*Plyler* shows that even unauthorized aliens enjoy certain constitutional rights, and so unauthorized status . . . cannot support a *per se* exclusion from 'the people' protected by the Bill of Rights." *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015); *see also United States v. Portillo-Munoz*, 643 F.3d 437, 445 (5th Cir. 2011) (Dennis, J., concurring in part and dissenting in part) ("It would be strange for the same founders who contemporaneously adopted the First, Second, Fourth, and Fifth Amendments to have intended for the Fifth Amendment to cover a different class of persons than the other three amendments, considering that 'people' is merely the plural of 'person.'").

Infamously, it was in *Dred Scott* that the Supreme Court construed "the people" to refer to citizens only. *Dred Scott v. Sanford*, 60 U.S. 393, 404, 417 (1857) (holding that because

"'people of the United States' and 'citizens' are synonymous terms, and mean the same thing," African Americans could have not been regarded by the States "as included in the word citizens" otherwise "it would give them the full liberty of speech in public and in private . . . and to keep and carry arms wherever they went").[6] *Heller* should not be read to resurrect *Dred Scott*. The Second Amendment right to bear arms is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). Instead, it ranks "among the fundamental rights necessary to our system of ordered liberty." *Rahimi*, 602 U.S. at 690. There is "no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded." *Meza-Rodriguez*, 798 F.3d at 672. In sum, the Second Amendment protects status-less aliens.

## II. Section 922(g)(5)(A) Is Unconstitutional under Bruen

Because the Second Amendment's plain text covers a status-less alien's possession of a firearm and ammunition, the Constitution presumptively protects such individuals against prosecution under section 922(g)(5)(A). *See Bruen*, 597 U.S. at 24 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). The burden thus shifts to the government to demonstrate that section 922(g)(5)(A) "is consistent with the Nation's historical tradition of firearm regulation." *Id.* The government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* It cannot do so.

*Bruen* and *Rahimi* instruct courts how to analyze whether a challenged regulation is consistent with historical tradition. *See Bruen*, 597 U.S. at 26–31, 34–70; *Rahimi*, 602 U.S. at

---

6 *See* Pratheepan Gulasekaram, *The Second Amendment's "People" Problem*, 76 VAND. L. REV. 1437, 1480 (2023).

691–700. First, the government must proffer historical analogues from the time of the Second Amendment's adoption in 1791 and—at least in the context of state laws—its incorporation against the states through the Fourteenth Amendment in 1868. *Bruen*, 597 U.S. at 34. Anything that pre- or post-dates those time periods "may not illuminate the scope of the right." *Id*. Second, the government must show similarity between "[w]hy and how the regulation burdens the right." *Rahimi*, 602 U.S. at 692. That is, a contemporary regulation is permissible only if it "impos[es] similar restrictions for similar reasons." *Id*. The "why" refers to the "societal problem" the statute is meant to target. *See Heller*, 552 U.S. at 631, 634, 636 (handgun violence in urban areas); *Bruen*, 597 U.S. at 27 (same); *Rahimi*, 602 U.S. at 698 ("to mitigate demonstrated threats of physical violence"). The "how" refers to the burden imposed by the regulation in its application, either in how the law is applied or what penalties attach. *See Heller*, 554 U.S. at 628 (a "total[] ban [on] handgun possession in the home"); *Bruen*, 597 U.S. at 12–13 (disarmament unless the individual demonstrates "proper cause" to licensing officials); *Rahimi*, 602 U.S. at 699 (disarmament following a "judicial determination[] of whether a particular defendant likely would threaten or had threatened another with a weapon").

If there is a "lack of distinctly similar historical regulation addressing th[e] [societal] problem," then this serves as "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. Where the "challenged regulation addresses a general societal problem that has persisted since the 18th century" the inquiry will be "straightforward." *Id*. at 26–27. Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id*.

The history and tradition analysis that applies to assessing the scope of the Second Amendment right borrows from how other constitutional rights are assessed. *Id.* at 24–25 (outlining First Amendment, Sixth Amendment, and Establishment Clause historical analysis). Any lowering of the government's burden in identifying sufficiently similar historical analogues implicates other constitutional Amendments that, like the Second Amendment, are "meant to codify a *pre-existing* right." *Id*. at 25. Furthermore, it is not enough for the government to point to isolated regulations that resemble the challenged regulation; it must present evidence of "early American *practice*" of the analogous regulation. *Id*. at 26 (emphasis added).

The government cannot carry this burden. There are no "distinctly similar" historical regulations because alien disarmament is a novelty of the 20th century. And there are no "relevantly similar" analogues—why and how section 922(g)(5)(A) burdens the individual right to bear arms is not sufficiently analogous to any Founding-era tradition of disarmament.

A. *There are no "distinctly similar" historical regulations disarming aliens*

There is no evidence of an early American practice to preclude unauthorized noncitizens from bearing arms. "[I]mmigration in the late 18th century was a common phenomenon," *Meza-Rodriguez*, 798 F.3d at 669, but there are no contemporaneous laws disarming unauthorized aliens. On the contrary, evidence from the time of the Second Amendment's ratification demonstrates that aliens bore arms and served in militias. *See, e.g.*, Ex. A, Act of April 1794, 1794 S.C. Acts 1, 5 (resolving "a doubt" that had "arisen" whether aliens were required to serve in the militia by providing that "all free white aliens or transient persons, above the age of eighteen and under the age of fortyfive years, who have resided or hereafter shall or may reside in this state, for the term of six months, shall immediately thereafter be and are hereby declared to be subject and liable to do and perform all patrole and militia duty"). This is consistent with the colonial practice of requiring all free white men to bear arms for the protection of the colony;

those exempted were enumerated and did not include aliens. *See, e.g.*, Ex. B, Act of May 8, 1746, 1746 N.J. Laws ch. 84, 302 (requiring that "all the Men that now do, or hereafter shall dwell, within the Districts or Divisions . . . , between the Age of Sixteen and Fifty Years . . . shall be sufficiently armed," and exempting only "the Gentlemen of His Majesty's Council, the Representatives of the General Assembly, Ministers of the Gospel, the Civil Officers of the Government, and all Field Officers and Captains, . . . Physicians, Schoolmasters, Millers, Ferrymen, bought white Servants, and Slaves"); Ex. C, Act of 1733, ch. 2, 1733 Va. Laws 333 (granting the government the authority to "list all Free Male Persons whatsoever, from Twenty One to Sixty Years of Age, within his respective County, to serve in Horse or Foot," with exclusions on the basis of race but not alienage); Ex. D, Act of 1672, 1672 Conn. Pub. Acts 49 (requiring that "all Male persons of the age from sixteen years of age, to the age of sixty (except Magistrates, Church officers, allowed Physitians, Chyurgeons, School-masters, Millers, constant Herds-men, and Marriners, who make it their constant business to go to Sea) shall bear Arms, unless they upon just occasion have exemption granted them by the Court[.]").

Research has revealed no law barring resident noncitizens from possessing a firearm on the basis of alienage prior to 1909. In that year, Pennsylvania enacted a statue providing:

> It shall be unlawful for any unnaturalized foreign-born resident to hunt for or capture or kill, in this commonwealth, any wild bird or animal, either game or otherwise of any description, excepting in defense of person or property; and to that end, it shall be unlawful for any unnaturalized foreign-born resident within this commonwealth to either own or be possessed of a shotgun or rifle of any make. *Commonwealth v. Patsone*, 231 Pa. 46, 48 (1911) (quoting Pa. Act of May 8, 1909 (P.L. 466 § 1)).

Upholding the statute against a Fourteenth Amendment challenge, the Supreme Court observed that "[t]he possession of rifles and shotguns" is not necessary except for hunting and that Pennsylvania's "prohibition does not extend to weapons such as pistols that may be supposed to be needed occasionally for self-defense." *Patsone v. Pennsylvania*, 232 U.S. 138, 143 (1914).

State statutes barring all aliens or unauthorized aliens from possessing handguns came only later, and the federal law at issue here traces its origin no further than the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, Title VII, § 1201, 82 Stat. 236. These 20th century regulations are far too recent to provide insight into the meaning of the Second Amendment. *See Bruen*, 597 U.S. at 66 & n.28 (striking down New York's 1913 licensing scheme, noting that "late-19th-century evidence cannot provide much insight," and refusing to even address "any of the 20th-century historical evidence brought to bear by respondents or their *amici*").

B. *There are no "relevantly similar" historical analogues to disarming aliens*

Absent a historical tradition of disarming aliens specifically, the government must demonstrate a historical practice that is "relevantly similar" and show that "'[h]ow and why the [historical] regulations burden[ed] a [person's] right to armed self-defense'" is "sufficiently similar to 'how and why' [section 922(g)(5)] burdens an individual's Second Amendment right." *Zherka*, 140 F.4th at 92. This is another burden the government cannot carry.

1. History and tradition reveal no analogues <u>relevantly similar to section 922(g)(5)(A)</u>

The government can point to no historical tradition of disarmament that is relevantly similar to section 922(g)(5)(A). The government will likely argue that section 922(g)(5)(A) aims to disarm individuals "outside the political community," and attempt to pass this nation's historical tradition of oath and allegiance laws as relevantly analogous. *See, e.g.*, *United States v. Pierret-Mercedes*, 731 F. Supp. 3d 284, 306–09 (D.P.R. 2024); *see* Br. of the U.S., *United States v. Balde*, 20 Cr. 281 (KPF) (S.D.N.Y. Sept. 6, 2022), Doc. 142 at 19–20, 24. However, the allegiance laws did not burden the Second Amendment right or carry section 922(g)(5)'s additional penalty of a lengthy prison term. *See* 18 U.S.C. § 924(a)(8) (authorizing up to 15 years' imprisonment for violations of 18 U.S.C. § 922(g)). Their only similarity is that section

922(g)(5), like those allegiance laws, rests on an unconstitutionally vague premise: that certain groups must be disarmed *not* because they are dangerous, but because they are untrustworthy.

Because, contrary to this Circuit's precedent in *Perez*, most out-of-circuit decisions conclude aliens are not among "the people," only the Seventh and Eleventh Circuits offer an analysis of historical tradition with respect to section 922(g)(5)(A). But the Eleventh Circuit's analysis in *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022), is not instructive because it predates *Bruen* and *Rahimi*.[7] The Seventh Circuit's analysis, in *United States v. Carbajal-Flores*, 143 F.4th 877 (7th Cir. 2025), should be rejected as flawed. Although *Carbajal-Flores* included a historical analysis, the analogues it examined were focused on why certain categories were historically excluded from "the people."[8] 143 F.4th 877, 882 (7th Cir. 2025). What the analogues did not show is that categories of *rightsholders* could be disarmed without any finding of dangerousness or disloyalty, or that they were subject to penalties similar to those imposed by section 922(g)(5)(A). Here, too, the government will be unable to identify

[7] In *Jimenez-Shilon*, the Eleventh Circuit assumed without deciding that the defendant was among "the people" protected by the Second Amendment but concluded nevertheless that "illegal aliens" could be disarmed. *See* 34 F.4th at 1045. Its review of the history is notable for its lack of any reference to early American laws or regulations disarming aliens *qua* aliens. It then concluded that aliens had historically been disarmed on the basis of faulty evidence. *Id*. at 1047. For example, the court wrote: "And with respect to firearms, in particular, 'the government was free to treat them as it pleased.'" *Id.* (quoting Patrick R. Charles, *The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: An Historical Perspective*, 15 TEX. REV. L. & POL. 61, 72 (2010)). But an examination of the cited text—which addressed 16th century England—reveals that it does not mention firearms or weapons at all. Elsewhere the court cited commentators for broad but unsupported statements. *E.g.*, *Id.* (citing Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 217 n.54 (1983) (opining in an unsourced footnote that "[t]he original intention would unquestionably also have been to exclude Indians and blacks on the ground of alienage or untrustworthiness")).

[8] *Bruen* and *Rahimi* make clear that history and tradition do not weigh on who is among "the people," but are only relevant in finding laws that analogously burden the right for relevantly similar reasons. *See Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 29).

analogous laws imposing burdens on rightsholders that are relevantly similar to section 922(g)(5)'s categorical disarmament and potential imprisonment for up to 15 years.

English laws disarming individuals based on lack of allegiance are not analogous. The Second Amendment's entire existence is premised on codifying a pre-existing right that the English monarchy had denied New World residents. *See* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 140 (1994). ("The English view carried across the Atlantic, where it was well understood that the right to bear arms did not extend to all New World residents."). What is evident is that English laws imposed categorical disarmament only on those groups that lacked the pre-existing right to begin with. *See Carbajal-Flores*, 143 F.4th at 883 (contrasting rights of aliens to those of "natural-born subjects" in the English tradition, where the former could have rights conditioned on allegiance to the government). For example, while Catholic disarmament was linked to allegiance, Catholics never had the right to arms. *See id.* ("The Second Amendment's predecessor, housed in the English Bill of Rights, guaranteed 'the subjects which are Protestants' the right to 'have arms for their defence, suitable to their conditions, and as allowed by law.' 1 W. & M. c. 2, § 7 (1689)."). This tradition at most shows certain groups were understood to not have the right to bear arms to begin with. This is irrelevant for delineating the *scope* of the Second Amendment, which guarantees the preexisting right of "the people" to bear arms. Even if these laws were somehow relevant, the way they burdened the right is disanalogous: individuals could either swear allegiance and obtain this right, *id.* at 884, or have their guns confiscated. *See Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett J., dissenting).

The same is true of the American tradition, although the history is different. During the colonial period, "it was well understood that the right to bear arms did not extend to all New

World residents." *Carbajal-Flores*, 143 F.4th at 884 (noting that enslaved persons and Native Americans faced gun restrictions (quotations omitted)). Disarmament in the colonies was fundamentally different from English disarmament:

> In considering the transfer of this police power to disarm to the American colonies, it is important to note the absence from the colonial context of both game laws limiting the right of gun ownership and the blanket authority to disarm found in English statutes. What took their place in British North America were laws disarming groups on the basis of race and servitude. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 158 (2007).

While these laws were also based on lack of allegiance, *id*. at 157, they are irrelevant because they again applied to non-rightsholders. Instead, the only potentially relevant analogues would come from "the state's police power to disarm Catholics, Quakers, and non-associators, populations of free white men entitled to the presumption of membership in the body politic." *Id*. at 156. But there is little actual tradition of such disarmament ever taking place: "[i]n the one instance in which an American colonial government acted to disarm Catholics, it did so on the basis of allegiance." *See id*. at 157. Other than that, "non-associators" were free white men who could be disarmed, but only if they refused a test of allegiance. *Id*. at 158. Thus, that there was a tradition of disarmament in the colonies of rightsholders is thin, and to the extent it existed, it burdened the right in a manner disanalogous from section 922(g)(5)(A).

After the revolution, disarmament based on allegiance shifted and "the newly minted states began adopting the embedded practice of conditioning the right to bear arms on one's loyalty to the sovereign—now, each respective state." *Carbajal-Flores*, 143 F.4th at 886 (citations omitted). Many states in 1777 passed Test Acts that "required all white men over eighteen to swear an oath declaring allegiance to the commonwealth . . . promising to do nothing injurious to the freedom and independence of the state. The act prohibited those refusing the test

from voting, holding office, serving on juries, suing, and transferring land. It also ordered them disarmed." Churchill, *supra*, at 159. These laws are not relevantly similar to section 922(g)(5)(A) because they served a different purpose and burdened the right in very different ways.

As to their purpose:

> These oath requirements as a prerequisite for firearm possession had nothing to do with noncitizen status, and were focused on disarming U.S. citizens, particularly suspected Loyalists, to prevent a potential armed rebellion or insurrection at the hands of Loyalists or British sympathizers. While [the Test Acts and section 922(g)(5)(A) were] both types of regulations premised on promoting public safety, the specific rationale for enacting the regulations were not related; oath requirements were meant to suppress potential rebellions by citizens and noncitizens alike. Abby Vorhees, *The Constitutionality of Barring Undocumented Immigrants from Second Amendment Protections*, 73 AM. U. L. REV. 929, 982–83 (2024) (footnotes omitted).

Moreover, the Test Acts also regulated in a different manner from section 922(g)(5)(A) by addressing the societal problem of "potential subversives" directly and universally, rather than on the basis of a legislative judgment about some subgroup. By contrast, the only status-based disarmament that occurred pre-ratification applied to individuals believed not to be rightsholders. *See Carbajal-Flores*, 143 F.4th at 886 (discussing laws prohibiting gun possession by enslaved people and Native Americans). This is not relevant historical evidence. Disarmament of those lacking Second Amendment rights does not need to "comport" with the Second Amendment—it has nothing to do with the right to begin with. *See Bruen*, 597 U.S. at 68 ("Absent any evidence explaining *why* these unprecedented prohibitions on *all* public carry were understood to comport with the Second Amendment, we fail to see how they inform 'the origins and continuing significance of the Amendment.'" (quoting *Heller*, 554 U.S. at 614)).

Nor can the government point to historical analogues from the post-enactment period (which, in any event, would have less probative value). *See id.* at 35. Again, categorical disarmament during the post-enactment period applied to those understood to lack Second

Amendment rights entirely—a step one question under *Bruen*. *See Carbajal-Flores*, 143 F.4th at 886 ("The unfortunate practice of disarming slaves and Native Americans survived the Revolutionary War, confirming the Founders adhered to the tradition of barring *groups deemed outside the polity* from keeping arms." (emphasis added)).

Thus, the only "longstanding" tradition the government will be able to cite to is a tradition of disarming people outside the polity (e.g., Native Americans and enslaved people). That tradition is irrelevant to understanding the scope of the Second Amendment right. In other words, the government cannot point to the disparate status or rights of disarmed classes in "prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. The scope of the Second Amendment right is not be defined by *who* was entitled to exercise it. It is defined by *how* it was exercised by rightsholders and the historical tradition of how the government could curtail its exercise by those rightsholders.

Accordingly, Founding- and post-Founding-era oath and allegiance laws are not relevantly similar to section 922(g)(5)(A). Thus, the government cannot carry its "burden to identify an American tradition justifying" the complete abrogation of aliens' Second Amendment rights under the "text-and-history standard." *Bruen*, 597 U.S. at 38–39.

2. Oath and allegiance laws and section 922(g)(5)(A) are similar only in that they are premised on the impermissibly vague notion of presumptive "untrustworthiness"

In pointing to oath and allegiance laws as "relevantly similar" to section 922(g)(5)(A), the government may argue, as it has before, that such laws disarmed individuals based on their presumed "untrustworthiness." *See* Br. of the U.S., *United States v. Carbajal-Flores*, 2024 WL 3730335, at *40–41 (7th Cir. July 29, 2024). But unlike dangerousness, untrustworthiness is not a proper justification for a categorical ban on firearms possession.

The concept of "untrustworthiness" is unconstitutionally vague.[9] In *Rahimi*, the Supreme Court made clear that for vague justifications, no historical analysis is necessary; disarmament for a vague purpose—in that case, "responsibility"—is never permitted. *See* 602 U.S. at 701 ("[W]e reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.' 'Responsible' is a vague term. It is unclear what such a rule would entail." (citations omitted)). "Untrustworthy" is as vague as "responsible."[10] While the government offered varying justifications in *Rahimi*, like "demonstrated threats of physical violence" or "present[ing] a special danger of misuse," 602 U.S. at 698, *presumed* dangerousness or untrustworthiness were not justifications the Court considered to be relevant. *See id*. (noting that the relevant justification for the statute was "to mitigate *demonstrated* threats of physical violence" (emphasis added)).

The legislative history of section 922(g)(5) confirms that the concern with noncitizen armament was not presumed dangerousness, but the presumption that those unlawfully present could not be trusted with firearms. As part of a late amendment, "hastily passed, with little discussion, no hearings and no report," Congress prohibited alien gun possession in Title VII of the Omnibus Crime Control and Safe Streets Act of 1968. *United States v. Bass*, 404 U.S. 336,

---

9 The government will not be able to provide any evidence that dangerousness, as opposed to untrustworthiness, was the justification for section 922(g)(5)'s enactment. Neither legislative history nor data establish that unlawful aliens were believed at the time of enactment to be, or in fact are, dangerous. *See Meza-Rodriguez*, 798 F.3d at 673 (noting the government has no data to support the assertion that unauthorized immigrants are more likely to commit gun-related crimes simply because their presence may show a willingness to defy the law (citations omitted)); *Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").

10 In fact, the government in *Rahimi* used "responsible" and "trustworthy" in the same breath. *See* Br. for the U.S., 2023 WL 5322645, at *42 (August 14, 2023) ("Here, the government has identified many historical laws that impose the same type of burden as Section 922(g)(8) (disqualifying someone from possessing arms) for the same type of reason (the person is not *responsible enough* to be *trusted* with arms)." (emphasis added)).

344 (1971); *see* Pub. L. 90-351, 82 Stat. 197, 228, 236 (June 19, 1968). As originally reported, the bill was primarily designed to assist in eight major areas of law enforcement need, all of which were administrative. *See* H.R. 5037, H. Rept. 488 at 10 (July 17, 1967). But in the midst of the 1967 Detroit riots, Congress became concerned with firearms specifically.[11] On August 3, 1967, Congressman Bingham moved to incorporate an amendment into H.R. 5037 that would add Title VI, which included an early version of Section 922. *See* 113 Cong. Rec. 21224–25. This version had status-based prohibitions targeting felons and fugitives, and prohibited only shipping or transporting firearms. *See id*. § 922(e), (f).[12] The bill passed the House on August 8, 1967, and was then referred to the Senate Committee on the Judiciary. 113 Cong. Rec. 21861, 22040. Before the Senate as S. 917, the Committee on the Judiciary offered a modified version of the bill, including section 922 as part of a "Concealed Weapons Amendment" intended to function as "bare minimum gun traffic control bill, primarily designed to reduce access to handguns for criminals, juveniles, and fugitives." S. Rept. 90-1097 at 189 (April 29, 1968).

Alien disarmament was first mentioned by Senator Long on May 17, 1968 when he moved to put Amendment 820 into the record. *See* 114 Cong. Rec. 13867. The proposed amendment would add Title VII, including Section 1201, which would ban possession by felons, those discharged from the army under other than honorable conditions, those mentally

---

[11] During debate on the bill, Congressman Poff asked, "why does this legislation not deal with such things as wiretapping, gun control, search and seizure, witness immunity, interrogation, probation, parole, rehabilitation and other such matters?" 113 Cong. Rec. 21091. He asked the Committee to look into these questions. Congressman McCarthy echoed these concerns and was the first to note that a comprehensive firearms legislation was necessary, highlighting the concern that major purchasers of firearms included "known dangerous criminals, mental defectives, angry spouses, habitual drunkards, children and drug addicts." 113 Cong. Rec. 21104. He noted that many arrested at the Detroit riots had felony records and had brought handguns into the city. *Id*. No mention of aliens was made at this time.

[12] These provisions originated from the Federal Firearms Act of 1938, which the Omnibus Crime Control bill repealed.

incompetent, citizens who have renounced citizenship, and aliens unlawfully present. *Id*. Senator Long argued the amendment was necessary because "there are a lot of lunatics, mental incompetents, and members of the criminal element who have guns and have been using guns to rob, plunder, and commit all sorts of crimes." 114 Cong. Rec. 13868. But with respect to aliens, all Senator Long offered was, "If he is an alien who is illegally in the United States, he should not be carrying firearms. He is one who should not be trusted to carry firearms." *Id*. Senator Long then confessed that the amendment took so long to reach the Senate floor because "[t]he Department of Justice sent a letter to the Committee on the Judiciary . . . indicating that they had a constitutional doubt that the Federal Government could outlaw the mere possession of weapons." *Id*. Senator Long reiterated this rationale a week later when he formally introduced the amendment in the Senate. 114 Cong. Rec. 14772–73. He restated his position on categorical disarmament and emphasized: "Clauses 1-5 describe persons who, by their actions, have demonstrated that they are dangerous*, or* that they may become dangerous. Stated simply, *they may not be trusted* to possess a firearm without becoming a threat to society." 114 Cong. Rec. 14773 (emphasis added). The bill was passed in the Senate the next day. 114 Cong. Rec. 14889.

Evident in Senator Long's discussion is that while all statuses covered "may not be trusted" it was not the case that each status was presumed dangerous. Some were seen as dangerous, and others, like unlawful aliens, were seen as potentially dangerous because they were untrustworthy. 114 Cong. Rec. 14773. At no point during the bill's consideration did any congressperson or congressional report suggest that disarming status-less aliens was justified because of their presumed dangerousness. While the bill moved through Congress, the justification for alien disarmament was never elaborated further, and the initial justification of presumed untrustworthiness was never disturbed.

Subsequent legislative history offers no other justifications for alien disarmament besides untrustworthiness. In October of 1968, Congress enacted the Gun Control Act, Pub. L. 90-618, 82 Stat. 1216 (Oct. 22, 1968). In the first House report on the bill, section 922 was amended to add disarmament for drug users and those deemed mentally incompetent. *See* H. Rept. No. 90-1577, at 14–15 (June 21, 1968). No efforts were made at that time to integrate alien disarmament into section 922. Only with the passage of the Firearm Owner's Protection Act in 1986 was Title VII of the Omnibus Crime Control Act repealed, Pub. L. 99-308, 100, Stat. 499, 459 (May 19, 1986, and section 922(g) updated to disarm anyone "who, being an alien, is illegally or unlawfully in the United States." *Id*. at 452; S. Rept. No. 98–583, at 12 (1986).

Thus, the justification for disarmament under section 922(g)(5)(A) is, and has always been, the presumed untrustworthiness of aliens. Because that rationale is vague, the law is facially unconstitutional. *Rahimi*, 602 U.S. at 701.

## **CONCLUSION**

For the foregoing reasons, the Court should hold that 18 U.S.C. § 922(g)(5) is unconstitutional and should dismiss the Superseding Indictment.

Dated: December 12, 2025
New York, New York

Respectfully submitted,

By: /s/ Neil Kelly

Neil P. Kelly
FEDERAL DEFENDERS OF NEW YORK
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700
neil_kelly@fd.org

*Counsel for Christhian Aybar-Berroa*