UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

MIGUEL FRANCISCO MORA NUNEZ
and CHRISTHIAN AYBAR-BERROA,

Defendants.

S1 25 Cr. 367 (LAP)

**MEMORANDUM OF LAW IN SUPPORT OF CHRISTHIAN AYBAR-BERROA'S MOTION FOR A SPECIAL ORDER PURSUANT TO LOCAL CRIMINAL RULE 23.1(h) AND FOR AN EVIDENTIARY HEARING**

FEDERAL DEFENDERS OF NEW YORK, INC.
Neil P. Kelly
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700
neil_kelly@fd.org

*Counsel for Christhian Aybar-Berroa*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 1

A. The Shooting Incident of July 19, 2025 ........ 2

B. The Defendant's Arrests ........ 3

C. The Initial Media Blitz ........ 3

D. Mr. Aybar-Berroa's Presentment and Judge Wang's Rule 23.1 Order ........ 9

E. The State Charges and Press Conference ........ 10

F. The Federal Indictment and Monthslong Delay before the Superseding Indictment ........ 11

G. The Preplanned and Well-Publicized January 8, 2026 Press Conference ........ 12

H. The Government's Highly Prejudicial Statements are Amplified and Spread ........ 16

I. The Defense Reminds the Government of Its Obligations under the Court's Rules and Orders, but Receives No Substantive Response ........ 17

ARGUMENT ........ 18

I. The Government Has Flagrantly Violated Local Rule 23.1 and Judge Wang's Order ........ 18

A. Local Rule 23.1 Applies to the Secretary of Homeland Security and Law Enforcement Agencies Involved in this Case ........ 19

B. The Numerous Presumptively Prejudicial Extrajudicial Statements Made by the Government Have Prejudiced the Defendants' Right to A Fair Trial ........ 22

C. Allegations of Purported Gang Involvement Are Particularly Inflammatory and Prejudicial to Defendants' Right to a Fair Trial ........ 26

II. The Court Should Enter A Special Order Pursuant to Local Rule 23.1 and Convene an Evidentiary Hearing ........ 28

A. The Court Should Enter A Gag Order ........ 29

B. The Court Should Order the Government To Remove All Offending Media ........ 31

C. The Court Should Order an Evidentiary Hearing Regarding the Government's Compliance with Local Rule 23.1 and Judge Wang's Order ........ 31

III. Continued or Knowing Violation of the Court's Rules and Orders Warrants Dismissal with Prejudice ........ 33

CONCLUSION ........ 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Application of Dow Jones & Co.*,
842 F.2d 603 (2d Cir. 1988)........ 29, 30

*Bank of Nova Scotia v. United States*,
487 U.S. 250 (1988)........ 34

*Bridges v. California*,
314 U.S. 252 (1941)........ 1

*Gannett Co., Inc. v. DePasquale*,
443 U.S. 368 (1979)........ 29

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976)........ 29

*Patterson v. Colorado*,
205 U.S. 454 (1907)........ 1

*Sheppard v. Maxwell*,
384 U.S. 333 (1966)........ 1, 29

*Skilling v. United States*,
561 U.S. 358 (2010)........ 33

*United States v. Adams*,
24 Cr. 556 (DEH) (S.D.N.Y. Oct. 25, 2024). ........ 20, 34

*United States v. Bulger*,
99 Cr. 10371 (DJC), 2013 WL 3338749 (D. Mass. July 1, 2013)........ 29

*United States v. Combs*,
24 Cr. 542 (AS) (S.D.N.Y. Oct. 25, 2024) ........ 20, 34

*United States v. Cuervelo*,
949 F.2d 559 (2d Cir. 1991)........ 24

*United States v. Cutler*,
58 F.3d 825 (2d Cir. 1995)........ 24

*United States v. Fields*,
592 F.2d 638 (2d Cir. 1978)........ 33, 34

*United States v. Jackson*,
19 Cr. 356 (ARR), 2021 WL 62109 (E.D.N.Y. Jan. 7, 2021) ........ 27

*United States v. Mangione*,
25 Cr. 176 (MMG) (S.D.N.Y. Apr. 25, 2025) .......... 20, 32, 34

*United States v. Nieves*,
58 F.4th 623 (2d Cir. 2023) .......... 27

*United States v. Owen*,
580 F.2d 365 (9th Cir. 1978) .......... 34

*United States v. Perryman*,
12 Cr. 123 (ADS), 2013 WL 4039374 (E.D.N.Y. Aug. 7, 2013) .......... 31

*United States v. Rivera*,
13 Cr. 149 (KAM), 2015 WL 1875658 (E.D.N.Y. Apr. 22, 2015) .......... 27, 28

*United States v. Silver*,
103 F. Supp. 3d 370 (S.D.N.Y. 2015) .......... 25, 34

*United States v. Smith*,
985 F. Supp. 2d 506 (S.D.N.Y. 2013) .......... 25, 29

*United States v. Stein*,
435 F. Supp. 2d 330 (S.D.N.Y. 2006) .......... 32

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008) .......... 33

*United States v. Walters*,
910 F.3d 11 (2d Cir. 2018) .......... 33

*United States v. Watson*,
23 Cr. 82 (EK), 2023 WL 7300618 (E.D.N.Y. Nov. 6, 2023) .......... 25

*United States v. Williams*,
504 U.S. 36 (1992) .......... 31

*United States v. Ventura*,
96 F.4th 496 (2d Cir. 2024) .......... 32

*Virgin Islands v. Fahie*,
419 F.3d 249 (3d Cir. 2005) .......... 34

**Statutes**

18 U.S.C. § 3 .......... 3

18 U.S.C. § 922(g)(5)(A) .......... 3

**Regulations**

28 C.F.R. § 50.2(b) .......... 21, 25

**Other Authorities**

M. Eisen et al., *Examining the Prejudicial Effects of Gang Violence on Jurors*, 13 J. FORENSIC PSYCH. PRAC. 1 (2013) ........ 27

E. Maeder et al., *The Combined Effect of Defendant Race and Alleged Gang Affiliation on Mock Juror Decision-Making*, 20 PSYCH., PSYC. & L. 188 (2013) ........ 28

Christhian Aybar-Berroa, through his undersigned counsel, respectfully submits this memorandum of law in support of his motion pursuant to Local Criminal Rule 23.1(h) and the Fifth and Sixth Amendments to the United States Constitution for a special order prohibiting extrajudicial statements and convening an evidentiary hearing regarding such statements to date.

## INTRODUCTION

All criminal defendants have a constitutional right to a fair trial, free from the influence of improper and prejudicial statements by the Government and its officials to the media. *See Sheppard v. Maxwell*, 384 U.S. 333, 360 (1966) (holding that court's failure to mitigate prejudice from pretrial publicity "by imposing control over the statements made to the news media by counsel, witnesses, and especially the . . . police officers" denied defendant his Sixth Amendment right to a fair trial); *see also Bridges v. California*, 314 U.S. 252, 271 (1941) ("Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."); *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.").

This case, however, has been tarnished by repeated, inflammatory, and prejudicial extrajudicial statements made about the defendants by members of the law enforcement agencies responsible for its investigation and prosecution. These glaringly impermissible and prejudicial statements have been made by high-ranking officials in pre-planned, well-organized press conferences designed to ensure maximum exposure and have been amplified by government public information offices and accounts to reach the broadest possible audience. The deluge of improper extrajudicial statements about the defendants made at the beginning of this case was bad enough. But recently, senior leadership of the law enforcement agencies involved in this case

have again engaged in facially improper extrajudicial commentary about the defendants' guilt, prior criminal records, purported gang associations, and character.

While media coverage and some limited public statements are to be expected in any high-profile case, the nature and tenor of the extrajudicial commentary in this case are almost without precedent. At this point, the flagrant character of these statements, their lack of any nexus to case developments, and their clear premeditation can support a conclusion that they are being made as part of an effort to prejudice the potential jury pool. To fulfill its affirmative constitutional duty to vindicate the defendants' rights to a fair trial and investigate misconduct, the Court should exercise its inherent supervisory authority and its discretion under the Local Rules of this District to mitigate the harm of the Government's improper extrajudicial commentary. Specifically, the Court should enter a special order pursuant to Local Criminal Rule 23.1(h) prohibiting extrajudicial statements about this case, ordering the Government and all law enforcement agencies involved in the investigation and prosecution of this case to remove material that violates Local Rule 23.1 from the domains and channels over which they have control, and convening an evidentiary hearing regarding the Government's compliance with Local Rule 23.1.

## FACTUAL BACKGROUND

### A. *The Shooting Incident of July 19, 2025*

Around midnight of July 19, 2025, an off-duty Customs and Border Patrol (CBP) officer and a female companion were sitting on rocks in a secluded area near the Hudson River in Fort Washington Park in Manhattan. Compl. ¶¶ 6(c)–(e). They were approached by an individual who appeared to be holding a firearm. *Id.* ¶ 6(f). The Government alleges that this individual was Mr. Mora Nunez, who it asserts had been riding on the back of a motorbike allegedly driven by Mr. Aybar-Berroa. *Id.* ¶ 6(a). The Government claims that the defendants were "indiscriminately rob[bing] unsuspecting New Yorkers" in the park when they approached the CBP officer and his

female companion. Doc. 27 at 5. As the individual who got off the motorbike approached the two people sitting on the rocks, gunfire was exchanged between the CBP officer and the individual. *See* Compl. ¶ 6(g).[1] The CBP officer was purportedly struck twice. *Id.*

B. *The Defendants' Arrests*

Early in the morning of July 20, 2025, Mr. Mora Nunez was admitted to a hospital in the Bronx with multiple gunshot wounds. The New York City Police Department (NYPD) promptly arrested him at the hospital in connection with unrelated probable cause "I-Cards" and an out of state warrant, and he was identified immediately as the suspected shooter of the CBP officer.

At approximately 3:00 a.m. on July 21, 2025, Mr. Aybar-Berroa was arrested in Queens, New York by Department of Homeland Security (DHS) agents for alleged immigration law violations. He was held in nominal immigration custody for three days, though he was interrogated by state and federal criminal law enforcement authorities. He was "arrested" again by DHS agents on July 24, 2025 in connection with a federal complaint that charged Mr. Mora Nunez with violating 18 U.S.C. § 922(g)(5)(A) and charged Mr. Aybar-Berroa with being an accessory after the fact to Mr. Mora Nunez's underlying offense in violation of 18 U.S.C. § 3.

C. *The Initial Media Blitz*

The shooting incident, which the Government alleges was part of an "indiscriminate" string of late-night robberies in Fort Washington Park and had nothing to do with the CBP's officer's employment, nonetheless precipitated an avalanche of public statements from the highest levels of the federal government. On July 20, 2025, DHS put out a press release declaring "Criminal Illegal Alien with Lengthy Rap Sheet Ambushes and Shoots CBP Officer in

---

[1] The Government's assertions are accepted as true for purposes of this motion, but the defendants do not concede any of these allegations.

New York City," which referred to Mr. Mora Nunez as "a criminal illegal alien," listed pending state and local charges he faced, and quoted the Assistant Secretary for Homeland Security as stating, "This violent criminal illegal alien had multiple run-ins with NYPD for assault and felony grand larceny before he ambushed and shot a CBP officer."[2] These assertions were repeated numerous times by the social media channels for DHS, the Secretary of Homeland Security, and the President of the United States.




At a press conference, the Mayor of the City of New York announced that Mr. Mora Nunez was in custody as a suspect in the shooting and stated that Mr. Mora Nunez

> has prior arrests for assault and violating an order of protection. At the time of this shooting, he had an active bench warrant from the Bronx, was wanted for a robbery from last December and a stabbing from January, a robbery from last December and a stabbing in January. In less than one year, he has inflicted

---

[2] https://www.dhs.gov/news/2025/07/20/video-criminal-illegal-alien-lengthy-rap-sheet-ambushes-and-shoots-cbp-officer-new

> violence in our city. And once he is charged for last night's crimes, we will be able to add attempted murder to his rap sheet. This individual also had an extradition warrant from Massachusetts for kidnapping.[3]

The NYPD Commissioner echoed these comments, stating that Mr. Mora Nunez

> has two prior arrests for domestic violence in New York, and he has an active warrant after not showing up to a court date on one of those cases. Additionally, Mr. Mora was wanted by this department on both a robbery from December 2024 and a felony assault stabbing from January 2025, both of which occurred in the Bronx. . . . Mr. Mora is also wanted outside of New York and Massachusetts for the robbery of a pawn shop in which guns were stolen in February 2025.[4]

The Police Commissioner noted that the Southern District of New York was investigating and prosecuting the case.

This media blitz continued after Mr. Aybar-Berroa was arrested. DHS put out another press release entitled "Second Criminal Illegal Alien with Lengthy Rap Sheet Arrested for Involvement in Ambush and Shooting CBP Officer in New York City," which referred to Mr. Aybar Berroa as a "criminal illegal alien" and purported to recite his "rap sheet."[5] This press release also quoted the Assistant Secretary of Homeland Security as stating:

> These violent thugs have committed a smorgasbord of crimes and been arrested multiple times and yet New York continued to release them, ignore an ICE detainer and allow them to continue to prey on Americans and terrorize our streets. How many people have to die, how many lives have to be changed forever for Mayor Adams and his sanctuary politician ilk to end these performative politics?[6]

The Department and Secretary of Homeland Security further amplified these claims on social media and in media appearances.

---

[3] https://www.youtube.com/watch?v=3_gXeivxS8c

[4] *Id.*

[5] https://www.dhs.gov/news/2025/07/21/second-criminal-illegal-alien-lengthy-rap-sheet-arrested-involvement-ambush-and

[6] *Id.*

Secretary Kristi Noem @Sec_Noem · Jul 21, 2025

The second suspect involved in the shooting of @CBP agent was caught by @ICEGov early this morning. Christhian Aybar-Berroa, is an illegal from the Dominican Republic. He entered the country illegally in 2022 under the Biden Administration and was ordered for final removed in 2023 by an immigration judge.

He has a criminal record in New York City and detainers were IGNORED thanks to @ericadamsfornyc sanctuary city policies.

He was arrested for reckless endangerment and larceny and was released before ICE could get him off the streets.



952 5.3K 17K 288K

Homeland Security @DHSgov · Jul 21, 2025

The second suspect involved in the shooting of the CBP Officer in NYC has been arrested.

Cristian Aybar Berroa, a criminal illegal alien from the Dominican Republic, illegally entered the United States on June 19, 2022, was apprehended near the border, and was then RELEASED into the country.

New York City IGNORED his detainer.

New York City IGNORED his crimes.



67 208 921 30K

The extrajudicial statements about the defendants reached a crescendo with a July 21, 2025 press conference at which appeared, among other high-ranking officials, the Secretary of Homeland Security, the Commissioner of Customs and Border Protection, the White House's "border czar," the Director of CBP Field Operations for the New York Field Office, and the Special Agent in Charge of the New York Field Office of Homeland Security Investigations (HSI).[7] These officials described how DHS, HSI, CBP, NYPD, and state and Southern District of New York prosecutors were acting jointly to investigate and prosecute the case.[8]

During this press conference, the Secretary of Homeland Security read out Mr. Mora Nunez's prior arrests, conflated him with terrorists, sexual predators, and murderers, and called

[7] https://www.dhs.gov/news/2025/07/21/secretary-noem-hosts-press-conference-provide-updates-shooting-customs-and-border

[8] *Id.*

him "scum of the earth."[9] She repeated that Mr. Mora Nunez "had been arrested four different times" and "never face[d] any consequences."[10] The Secretary of Homeland Security then—after invoking 9/11 and the 1993 attacks on the World Trade Center—stated about the defendants:

> Remember, people came to this country through an open border and those policies they were terrorists, suspected terrorists, people who were violent criminals from across the world, individuals who were emptied out of prisons and mental institutions. And they came to this country and Joe Biden and his administration just opened the door and let them flood in. The individuals that perpetuated this crime and violence against our law enforcement officer on Saturday night and his friend were two of those exact same type of individual that crossed the border under those policies.[11]

The Secretary and Department of Homeland Security then repeated and amplified these claims on their social media accounts and through other media channels.



Homeland Security @DHSgov

Make no mistake: this criminal illegal alien pulled the trigger but Mayor @ericadamsfornyc and the sanctuary politicians in this country like him have blood on their hands.

Innocent Americans have lost their lives, suffered horrific sexual violence, and endured unspeakable trauma at the hands of dangerous criminals who should have been swiftly removed from our communities.



Last edited 10:03 AM · Jul 21, 2025 · 93.4K Views



Homeland Security @DHSgov

This criminal was arrested in New York FOUR times. Yet he was released back into our communities just to commit more crimes.

There is absolutely ZERO reason why this criminal illegal alien should have been allowed to roam free on our streets.



10:18 AM · Jul 21, 2025 · 111.6K Views

---

9 https://www.dhs.gov/news/2025/07/21/secretary-noem-hosts-press-conference-provide-updates-shooting-customs-and-border

10 *Id.*

11 *Id.*

In a separate press conference that same day, the NYPD Commissioner stated:

> First, the shooting incident involving the off-duty Customs and Border Protection officer on Saturday. Our federal partners on the HSI Violent Gangs Task Force have now apprehended the second suspect, the alleged scooter driver. His name is Cristian Aybar Berroa. Once Mr. Berroa was in custody, NYPD homicide detectives conducted a debrief of him.
>
> During that interrogation, Berroa implicated both himself and the person we had identified as a person of interest in the shooting, Miguel Mora. We expect both Berroa and Mora to be charged federally today by the Southern District. A bit more about Mr. Berroa. He was arrested eight times between March and April 2024 for grand larcenies and robberies involving a scooter in the Bronx. He's also a suspect in at least four additional cases.[12]

These allegations and accusations from high-ranking government officials—including repeated invocation of the defendants' criminal histories, purported confessions, and association with dangerous criminal elements—were repeated nationwide in news media and on social media.


NEW YORK POST
Page Six
MONDAY, JULY 21, 2025 / Sunny, breezy, 82° / Weather: P. 34 ★★ LATE CITY FINAL nypost.com $2.00

LAND OF THE FREE

An off-duty US Customs and Border Protection officer was shot in the face after being robbed Saturday in a Manhattan park by a moped-riding illegal immigrant identified as Miguel Francisco Mora Nunez (right), a 21-year-old Dominican national with a lengthy rap sheet in New York according to sources — but he was let go each time he was busted, despite having a deportation order.

PAGES 4-5

Illegal migrant busted in NYC border-agent shooting was arrested and let go four times

12 https://www.nyc.gov/mayors-office/news/2025/07/transcript--mayor-adams-and-nypd-commissioner-tisch-announce-mil

D. *Mr. Aybar-Berroa's Presentment and Judge Wang's Rule 23.1 Order*

Three days after his arrest, Mr. Aybar-Berroa was finally presented before Magistrate Judge Ona T. Wang on July 25, 2025. The presentment was not held in the standard arraignments Courtroom 5A at the Daniel Patrick Moynihan Courthouse but was convened in the much larger Courtroom 24B to accommodate media members and the dozens of DHS and CBP officers who filled every available public seat in the courtroom.

Given the high level of public and media attention directed at the case, and in light of the numerous inflammatory public statements that high-ranking government officials had made about the defendants, which had been widely disseminated by the media, counsel for Mr. Aybar-Berroa requested an order from Magistrate Judge Wang pursuant to Local Rule 23.1 "reminding the parties, their affiliated agencies, and individuals working under their direction to not make extrajudicial statements that might be prejudicial to the outcome of the case and Mr. Aybar-Berroa's right to a fair trial." Tr. 7:19–25, *United States v. Aybar-Berroa*, 25 Mag. 2309 (OTW) (July 25, 2025). Defense counsel confirmed that it was requesting "a reminder to the government and affiliated agencies of the standing obligations under [Rule] 23.1." *Id.* 9:7–11. Defense counsel pointed Magistrate Judge Wang to similar orders that had been issued by courts in this District in recent high-profile cases in which there had been much extrajudicial commentary. *See id.* at 8:12–16.

With no objection from the Government, Magistrate Judge Wang ordered the following, referring to the many DHS agents and officers in the courtroom: "Under Local Criminal Rule 23.1, the government and affiliated agencies -- and I note that many of the agency employees are here -- are reminded of their obligations to comply with Local Criminal Rule 23.1. Those obligations are ongoing." *Id.* at 9:14–18.

Despite Magistrate Judge Wang's July 21, 2025 order, however, numerous news articles were subsequently published that reported law enforcement's purported investigation into other, uncharged offenses of the defendants, with information about the defendants' arrest records, other alleged offenses, and general character being attributed to "law-enforcement sources."[13]

E. *The State Charges and Press Conference*

On August 6, 2025, the defendants were charged by the Manhattan District Attorney's Office with various state offenses for the same underlying conduct alleged in the federal complaint. The same day, the Manhattan District Attorney put out a press release and convened a press conference addressing the charges. Notwithstanding the pendency of the federal criminal case, the applicability of Local Criminal Rule 23.1, and Magistrate Judge Wang's order, law enforcement officials directly involved in the investigation and prosecution of this case made numerous extrajudicial statements about it. For example, the press release quotes the HSI New York Special Agent in Charge as saying: "Miguel Mora and Cristhian Aybar juggled with fate, and lost, when they set out on their alleged robbery spree last month. Throughout much of their time in the U.S., and as culminated with the events of July 19, they disrespected the sanctity of life and the American rule of law. In the process, they changed the course of their own lives, and tragically, that of an innocent, unsuspecting off-duty CBP officer."[14]

At the press conference, the Mayor stated, "We want to thank this office for bringing this indictment and bringing these two individuals to justice. They were dangerous. They did not care

---

13 *See, e.g.*, J. Marino et al., "NYPD probes whether moped-robber migrant shot by NYC cop and shooting of border agent are related crimes," N.Y. Post (Aug. 18, 2025), https://nypost.com/2025/08/18/us-news/possible-tie-between-moped-robber-migrant-shot-by-nyc-cop-and-shooting-of-border-agent/.

14 https://manhattanda.org/d-a-bragg-announces-state-charges-in-shooting-of-off-duty-customs-and-border-protection-officer/

who they were harming on our streets."[15] The Special Agent in Charge also stated, "Whether knowingly or not, when these perpetrators allegedly targeted one of us, they targeted all of us." Special Agent Patel acknowledged that he should be limited in his statements about a case that was then pending in two separate courts, but repeated that Messrs. Mora Nunez and Aybar-Berroa "shouldn't have been in this country and if they were deported and or not allowed to be in this country this tragedy wouldn't happened."[16]

This press conference and the statements made by these officials were again covered widely in the media and on social media.[17]

F. *The Federal Indictment and Monthslong Delay before the Superseding Indictment*

On August 13, 2025, the defendants were federally indicted and charged with the same offenses alleged in the federal criminal complaint. The day before, the NYPD had executed a search warrant on Mr. Aybar-Berroa's former shelter and purportedly found ammunition in his belongings. After a delay of three months, on November 13, 2025, the Superseding Indictment was unsealed, which additionally charged Mr. Aybar-Berroa with the substantive offense of violating section 922(g)(5)(A) based on the allegation that the same ammunition possessed by Mr. Mora Nunez was located at Mr. Aybar-Berroa's residence.

Notably, in none of the charging documents in the state or federal case were Mr. Mora Nunez and Mr. Aybar-Berroa charged with any gang-related offenses or accused of being members of a gang or larger criminal organization.

---

15 https://www.youtube.com/watch?v=AFUhEjqY12E

16 *Id.*

17 *See, e.g.*, "New York indicts 2 migrants after botched robbery led to shooting of customs officer in NYC," Eyewitness News (Aug. 6, 2025), https://abc7ny.com/post/new-york-state-indicts-2-migrants-botched-robbery-led-shooting-customs-border-patrol-officer-washington-heights/17453212/

G. *The Preplanned and Well-Publicized January 8, 2026 Press Conference*

On January 8, 2026, five and a half months after charges were filed in this case, yet only one day after Renée Good, a 37-year-old American citizen, was fatally shot in Minneapolis, Minnesota, by an Immigration and Customs Enforcement (ICE) agent, the Secretary of Homeland Security convened another press conference in New York to discuss this case and these defendants. Before this press conference occurred, it was widely reported, with planned protests in Foley Square and at the World Trade Center where the press conference was being held.[18] This press conference also featured the Director of CBP, the Special Agent in Charge of HSI's New York Field Office, and the Director of the CBP's New York Field Office.

Despite the pendency of this case, the applicability of Local Rule 23.1, and Magistrate Judge Wang's order, this press conference included numerous extrajudicial statements about the defendants, their purported guilt, their alleged criminal histories, their character, and other highly prejudicial information. The press conference (and accompanying press release) featured large posterboard mugshots of the defendants with the word "ARRESTED" in all capital letters and listing their prior state arrests (not convictions).[19]







[18] *E.g.*, https://x.com/PeoplesForumNYC/status/2009025005070238036

[19] https://www.dhs.gov/news/2026/01/09/secretary-noem-announces-success-operation-salvo-new-york-city-following-shooting

During this press conference, the Secretary of Homeland Security stated that the defendants "had long criminal rap sheets and were released by the Biden administration and continued to be released by leaders in this city to perpetuate crimes against the citizens that live here."[20] She then stated that "these scumbags" (referring to the defendants) "were affiliated with a transnational criminal organization, the notorious Trinitarios gang in New York."[21] After noting the cooperation of the U.S. Attorney's Office for the Southern District of New York, she stated that DHS had arrested numerous individuals who she alleged were "violent transnational gang members and affiliates associated with the Trinitarios who are responsible for weapons trafficking, for human smuggling, for narcotics distribution, and for armed robberies," and "had perpetuated violent attacks across the city of New York."[22]

The Director of CBP Field Operations repeated the allegation that the defendants in this case "were affiliated to the Trinitarios gang."[23] The Director of Field Operations for ICE followed by stating, "What makes this case particularly egregious is both of these violent criminals had been in NYPD custody on multiple occasions." [24] He continued that federal law enforcement worked to "not only locate and arrest the two criminal aliens responsible for the shooting, but also to identify, locate, and apprehend their Trinitario associates, ruthless gang members who engage in illicit activity and terrorize law-abiding New Yorkers." [25] The Director of Field Operations for ICE went on to state that the individuals they had arrested as part of this

---

20 https://www.youtube.com/watch?v=_TVTT6jHcFo

21 *Id.*

22 *Id.*

23 *Id.*

24 *Id.*

25 *Id.*

initiative had "felony convictions, including weapons offenses, drug offenses, robbery, assault, rape, sexual abuse, burglary, and larceny." [26]

In addition, the Special Agent in Charge of the New York Field Office of HSI stated, "In the days, weeks, and months that followed [the shooting at issue], together with law enforcement, we pursued every known associate of this violent migrant gang crew. . . . Our investigation led to the capture of individuals tied to violent transnational gangs, including associates of the Trinitarios gang that are responsible for weapon trafficking, human smuggling, narcotics distribution, armed robberies, and repeated violent attacks across the Big Apple."

The accompanying press release referred to the defendants as "criminal illegal alien gang members," claimed they were "members of the notorious Trinitarios gang," and asserted that the Trinitarios, "in addition to the July shooting of the off-duty CBP officer, are responsible for: weapons trafficking, human smuggling, narcotics distribution, armed robberies, and previous violent attacks across New York City."[27] DHS again reiterated that the investigation and prosecution of this case, and related investigations, involved DHS, HSI, CBP, NYPD, "and federal prosecutors from the Southern District of New York (SDNY)."[28]

These accusations were repeated through media channels and social media channels of DHS, the Secretary of Homeland Security, and the White House.

---

[26] *Id.*

[27] https://www.dhs.gov/news/2026/01/09/secretary-noem-announces-success-operation-salvo-new-york-city-following-shooting

[28] *Id.*

**Rapid Response 47** @RapidResponse47

.@Sec_Noem with an update on NYC immigration enforcement:

"We've arrested 54 individuals… those arrested are violent transnational gang members, and affiliates associated with Trinitarios, who are responsible for weapons trafficking, for human smuggling…armed robberies."




11:47 AM · Jan 8, 2026 · **91.3K** Views

181 757 3.1K 57

Homeland Security reposted

**Secretary Kristi Noem** @Sec_Noem · Jan 8

Operation Salvo in New York City has removed 54 criminal illegal aliens from violent transnational gangs, including members and affiliates of the Trinitarios. These arrests and removals represent a significant blow to a criminal network that has been terrorizing American neighborhoods for far too long.

DHS is on offense: The Trump Administration is using every tool we have.




1.1K 1.5K 6.9K 129K

**Homeland Security** @DHSgov

Under the leadership of @Sec_Noem, Operation Salvo is targeting and removing the violent criminal networks that have found sanctuary in New York City.

Operation Salvo is sending a message to every single criminal illegal alien who thinks they can hide behind sanctuary policies. You can't. Leave now before it's too late.




1:14 PM · Jan 8, 2026 · **62.2K** Views

321 695 3.2K 52

Homeland Security reposted

**The White House** @WhiteHouse · Jan 8

🔥@Sec_Noem: "If you lay a finger on one of our officers, we will catch you, we will prosecute you, and you will feel the full extent of the law."




3.7K 3.4K 15K 293K




**sec_noem** and **dhsgov**
Original audio

**sec_noem** 2w
Operation Salvo in New York City has removed 54 criminal illegal aliens from violent transnational gangs, including members and affiliates of the Trinitarios. These arrests and removals represent a significant blow to a criminal network that has been terrorizing American neighborhoods for far too long.

DHS is on offense: The Trump Administration is using every tool we have.

13.1K 5.9K

January 8

H. *The Government's Highly Prejudicial Statements Are Amplified and Spread*

Given the heightened scrutiny of DHS and the Secretary of Homeland Security in the aftermath of the killing of Ms. Good in Minnesota, the January 8, 2026 press conference was widely covered in the media and on social media. This ensured that the highly prejudicial and inflammatory statements made by law enforcement during this press conference, including that the defendants were members of the Trinitarios, were reported far and wide, including in the news outlets potential jurors consume. For example, the New York Post reported, "'Operation Salvo' targeted the Trinitarios street gang and took 54 members of the crew off the streets—with the feds laser-focused on the task after two reputed members shot and wounded the 42-year-old agent at Fort Washington Park on July 19," and quoted the Secretary of Homeland Security as saying, "Those arrested are violent transnational gang members and affiliates associated with Trinitarios, who are responsible for weapons trafficking, for human smuggling, for narcotics distribution and for armed robberies. . . . They had perpetuated previous violent attacks across the city of New York City." K. Sheehan & J. Fitz-Gibbon, "Kristi Noem touts roundup of 54 immigrant gangbangers after NYC shooting of off-duty CBP cop," N.Y. Post (Jan. 8, 2026).[29]

The New York Times reported that Secretary Noem announced

> the arrest of 54 people accused of being affiliated with a Dominican street gang, after an investigation into the shooting of an off-duty customs officer in Manhattan last summer. Two men from the Dominican Republic were charged in the attack on the officer, who survived, and the incident prompted Trump officials to respond with a broader crackdown focused on people associated with the Trinitarios gang. . . . The two suspects, both Dominican immigrants with prior arrests, were detained within 48 hours and charged in the shooting. But Ms. Noem said that the shooting led federal investigators to embark on a monthslong operation to detain other immigrants engaged in criminal activity. They homed in on the Trinitarios, a violent Dominican street gang that sprang from the Rikers

[29] https://nypost.com/2026/01/08/us-news/kristi-noem-touts-roundup-of-54-immigrant-gangbangers-after-nyc-shooting-of-off-duty-cbp-cop/.

> Island jail in the 1990s, spreading outside the United States and becoming a source of consternation for the police in New York and elsewhere. L. Ferre-Saduri & A Ley, "Noem Defends Officer in Minneapolis Killing and Attacks Mamdani," N.Y. Times (Jan. 8, 2026).[30]

WNYC and Gothamist similarly reported the Secretary's accusations:

> The "Operation Salvo" arrests followed the shooting of an off-duty Customs and Border Protection officer in Upper Manhattan in July, allegedly by two individuals Noem said were affiliated with the Trinitarios. Miguel Mora Nunez, 21, and Christhian Aybar-Berroa, 22, were charged shortly after the July 19 shooting in Fort Washington Park, in which an unidentified CBP officer was seriously injured. A. Sundaram, "DHS Secretary Noem says NYC gang crackdown netted 54 arrests, backs ICE agent in Minneapolis shooting," Gothamist (Jan. 8, 2026).[31]

Newsmax summarized the press conference succinctly:

> Homeland Security Secretary Kristi Noem announced Thursday that federal authorities have arrested 54 alleged members of the Trinitarios gang in New York City as part of "Operation Salvo," a coordinated crackdown targeting one of the region's most violent criminal organizations.
>
> Speaking at a press conference, Noem said the gang with Dominican origins was responsible for a string of violent crimes, including the brutal shooting of an off-duty U.S. Customs and Border Protection officer in July. J. Morley, "Noem: 54 Arrested in NYC Gang Tied to CBP Officer Attack," Newsmax (Jan. 8, 2026).[32]

### I. *The Defense Reminds the Government of Its Obligations under the Court's Rules and Orders, but Receives No Substantive Response*

Shortly after the widely publicized and highly prejudicial statements from the January 8 press conference, the defense contacted Government counsel reminding the Government of its obligations under Rule 23.1 and Magistrate Judge Wang's order. The defense asked the Government to identify what steps it had taken to inform DHS and other law enforcement

---

30 https://www.nytimes.com/2026/01/08/nyregion/kristi-noem-ice-minneapolis.html

31 https://gothamist.com/news/dhs-secretary-noem-says-nyc-gang-crackdown-netted-54-arrests-backs-ice-agent-in-minneapolis-shooting

32 https://www.newsmax.com/us/kristi-noem-operation-salvo-trinitarios/2026/01/08/id/1241342/

personnel involved in this prosecution of their obligations under Local Rule 23.1; what steps the Government has taken in response to the admonishments made by other Judges in this District to law enforcement for extrajudicial statements regarding pending prosecutions; and what steps the Government proposed to take to remedy the prejudice of the January 8, 2026 press conference and the highly inflammatory statements that were made and widely distributed during and after this press conference. The Government did not provide a substantive response to these questions.

Following the parties' colloquy with the Court on January 28, 2026, the defense requested confirmation that the Government had directed all law enforcement personnel involved in the investigation or prosecution of this case to not make any extrajudicial statement in violation of Local Rule 23.1; that the Government would direct law enforcement involved in the investigation and prosecution of this case to remove from their channels all material that violates Local Rule 23.1; and that the Government recognized that further violation of the Court's rules and orders regarding extrajudicial statements may result in dismissal of this case with prejudice. In response, the Government repeated to the defense that "we take seriously our obligations under Local Rule 23.1, and we have/are in the process of contacting our relevant law enforcement partners to remind them of the particulars of the Rule and of our Office's availability to discuss any questions about the Rule or how to comply." Email from SAUSA Khairy (Jan. 28, 2026). The Government did not otherwise address the defense's concerns.

## ARGUMENT

### I. The Government Has Flagrantly Violated Local Rule 23.1 and Judge Wang's Order

The bounds of what the Government and affiliated law enforcement personnel may not say to the media about a pending prosecution are defined by numerous sources of law, including this Court's rules, Court orders, and departmental regulations, all guided by bedrock constitutional principles. These strictures exist to ensure that defendants, particularly those in

high-profile cases, receive due process and a fair trial. The Government's repeated violation of these fundamental precepts threatens this right. While disputes over extrajudicial statements are often close questions, the brazenness of the Government's repeated violations here warrants a meaningful response, lest the Court's rules and orders be seen as merely advisory.

### A. *Local Rule 23.1 Applies to the Secretary of Homeland Security and Law Enforcement Agencies Involved in this Case*

This Court's rules strictly regulate what may or may not be said about a pending prosecution. When a grand jury or criminal investigation is pending, Local Criminal Rule 23.1(b) ("Fair Trial Directives") prohibits

> any extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation, if there is a substantial likelihood that the dissemination will interfere with a fair trial or otherwise prejudice the administration of justice. Local Cr. R. 23.1(b).

Local Rule 23.1(e) identifies certain subject matters that are generally permissible for the Government to disclose, such as the "facts and circumstances of arrest" and "a brief description of the offense charged." Local Cr. R. 23.1(e). But Local Rule 23.1(d) lists subject matters that "presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." These include "the prior criminal record (including arrests, indictments, or other charges of crime)" of the accused; "the character or reputation of the accused"; "the existence or contents of any confession, admission, or statement given by the accused"; "information the lawyer . . . knows is likely to be inadmissible at trial and would if disclosed create a substantial likelihood of prejudicing an impartial trial"; and "any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case." *Id.*

These strictures were emphasized by Magistrate Judge Wang at Mr. Aybar-Berroa's presentment, when she reminded the Government and affiliated law enforcement personnel—whom she addressed directly—of their objections under the Court's rules. That Local Rule 23.1 applies to the law enforcement agencies involved in the investigation and prosecution of this case was made perfectly clear by Magistrate Judge Wang's order (to which the Government had no objection), which was consistent with the rulings of other judges in this District. *See, e.g.*, *United States v. Combs*, 24 Cr. 542 (AS) (S.D.N.Y. Oct. 25, 2024), Doc. 50 (issuing "an order underscoring the parties' existing responsibilities under Local Rule 23.1" and noting that the rule applied to "anyone involved with this case or the related investigation," including "the agencies involved in this case or the related investigation"); *Combs*, 24 Cr. 542 (AS) (S.D.N.Y. Nov. 8, 2024), Doc. 63 (reiterating the requirements of Local Rule 23.1 and requiring the Government "to make those requirements clear to anyone involved in this case"); *United States v. Adams*, 24 Cr. 556 (DEH) (S.D.N.Y. Jan. 13, 2025), Doc. 93 (restating the scope of Local Rule 23.1, reiterating that it applied to "the Government, and all local and federal law enforcement agents assigned to this case or the related investigation, assisting with this case or the related investigation, or who have assisted with this case or the related investigation," and directing the Government to "notify agencies involved in this case of the obligations imposed on them by Local Rule 23.1"); *cf. United States v. Mangione*, 25 Cr. 176 (MMG) (S.D.N.Y. Apr. 25, 2025) Doc. 27 at 17:18–18:3 (reminding the parties of their obligations under Local Rule 23.1 and directing the Government to convey this admonishment to the United States Attorney, Attorney General of the United States, and any "subordinates at Main Justice"); *Mangione*, 25 Cr. 176 (MMG) (S.D.N.Y. Sept. 24, 2025), Doc. 53 (reiterating that Local Rule 23.1 applied to "the highest levels of the Department of Justice, up to and including Attorney General Bondi").

The unambiguous prohibitions of the Court's rule, its clear applicability to the law enforcement agencies involved in this case, and Magistrate Judge Wang's admonishment should have sufficed to ensure the Government's compliance with Local Rule 23.1. Had there been any doubt, however, the Government was further bound by Department of Justice (DOJ) and DHS regulations and directives that similarly prohibit prejudicial, extrajudicial statements that imperil defendants' right to a fair trial.

DOJ regulations prohibit public statements that "may reasonably be expected to influence the outcome of a pending or future trial." 28 C.F.R. § 50.2(b)(2). These regulations permit the disclosure of basic information like "[t]he substance or text of the charge, such as a complaint, indictment, or information." *Id.* § 50.2(b)(3)(ii). But such disclosures "should include only incontrovertible, factual matters, and should not include subjective observations." *Id.* § 50.2(b)(3). DOJ personnel are strictly prohibited from disclosing "any information concerning a defendant's prior criminal record." *Id.* § 50.2(b)(4). DOJ regulations recognize that "certain types of information generally tend[] to create dangers of prejudice without serving a significant law enforcement function," and therefore direct DOJ personnel not to disseminate, *inter alia*, "[o]bservations about a defendant's character"; "[s]tatements, admissions, confessions, or alibis attributable to a defendant"; or "[a]ny opinion as to the accused's guilt." *Id.* § 50.2(b)(6). DOJ also prohibits any action "to encourage or assist news media in photographing or televising a defendant or accused person being held" in custody and directs personnel to not make "available photographs of a defendant unless a law enforcement function is served." *Id.* § 50.2(b)(7).

DHS directives instruct all personnel that in criminal cases where an arrest has been made and charges have been filed, "all statements and news releases by DHS and its organizational elements will be coordinated with the appropriate U.S. Attorney prior to release." Dep't

Homeland Sec., DHS Directives Sys., MD No. 111-03, "Coordination with U.S. Attorneys' Offices for Release of Information," ¶ VI.A.1.b (May 31, 2007).[33] These rules direct that "[a]t no time shall any personnel of DHS and its organizational elements furnish any statement or information to influence the outcome of a trial." *Id.* ¶ VI.A.1.d. Limited exceptions are provided for basic information about the defendant, charges, investigation, and arrest, but DHS personnel are instructed to not release any of the following information: "[o]bservations about a defendant's character;" "[s]tatements, admissions, confessions, or alibis attributable to a defendant"; or "[s]tatements concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial." *Id.* ¶ VI.A.1.e. DHS directives permit mugshots of defendants to be provided to the news media for purposes of locating fugitives and developing investigative leads, "but the accused shall not be posed." *Id.* ¶ VI.A.2.a.

### B. *The Numerous Presumptively Prejudicial Extrajudicial Statements Made by the Government Have Prejudiced the Defendants' Right to A Fair Trial*

The extrajudicial statements in this case (none of which have been responded to by the defense) have gone well beyond what is permissible under the Court's rules and orders, and the relevant departmental regulations. These gratuitous statements serve no proper law enforcement purpose and act solely to inflame the public and prejudice the defendants' rights to a fair trial.

Throughout the pendency of this case, from the investigation leading to the arrests of the defendants through the January 8, 2026 press conference, the U.S. Attorney's Office has been in close coordination with DHS, CBP, HSI, NYPD, and other law enforcement. DHS regulations required the coordination of all public statements about this case with the U.S. Attorney's Office. This Office knew of its obligations under Local Rule 23.1 and had been informed by Judges in

[33] https://www.dhs.gov/sites/default/files/publications/mgmt/public-affairs/mgmt-dir_111-03-coordination-us-attorneys-offices-release-info_revision-00.pdf

no fewer than three recent cases in this District that these strictures on extrajudicial statements about pending criminal cases also applied to law enforcement agencies involved in the prosecution of such cases. Nevertheless, for days following the incident at issue in this case, the highest-ranking officials of the federal and city governments and law enforcement agencies made numerous improper and presumptively prejudicial statements in plain violation of Local Rule 23.1, DOJ regulations, and DHS directives. These included repeated invocations of the defendants' prior arrest records; circulation of the defendants' mugshots (after they had been arrested); unqualified statements of the defendants' guilt (not just what they were alleged to have done); recitations of their purported confessions; deliberate attacks on their character ("scum of the earth"; "violent thugs"; "terrorists"); and association of the defendants with other offenses they had nothing to do with.

At Mr. Aybar-Berroa's presentment, Magistrate Judge Wang clearly instructed the Government (without any objection) that Local Rule 23.1 applied to members of affiliated law enforcement agencies involved in this case. That did not stop affiliated law enforcement agencies from publicly stating and leaking prohibited information to the media or prevent the wildly improper January 8, 2026 press conference.

By the time of the January 8, 2026 press conference, more than five months after the defendants' arrests and Magistrate Judge Wang's order, there was no doubt that the Government and the law enforcement agencies involved in the prosecution of this case were subject to the strictures of Local Rule 23.1. Nonetheless, the highest-ranking officials at DHS convened a well-planned and publicized press conference (which the Government had ample opportunity to prevent), at which they repeatedly invoked the defendants' arrest records; posed mugshots of them with the word "ARRESTED" written in large letters and their prior arrest charges spelled

out; accused the defendants of being members of the Trinitarios gang and involved with uncharged offenses including weapons trafficking, human smuggling, narcotics distribution, sexual abuse, and acts of violence across the city; and referred to the defendants as "scumbags," "violent criminals," "ruthless gang members," and part of a "violent migrant gang crew."

The statements made by the Government's law enforcement partners and amplified repeatedly by the highest levels of the government and throughout the media have deeply prejudiced the defendants' right to a fair trial by impugning their reputations, insulting their character, disseminating their mugshots and prior arrests, and associating them with criminal gangs, gang activity, and much more serious offenses that are not alleged or charged in this case. The press conferences, press releases, media availabilities, and social media posts by these high-ranking officials have not bothered to state that the defendants are only alleged to have committed certain offenses and that they are entitled to the presumption of innocence.

Potential prejudice is evaluated "at the time a statement is made," so it is no defense that a statement in violation of Local Rule 23.1 did not *actually* prejudice the eventual jury. *United States v. Cutler*, 58 F.3d 825, 836–37 (2d Cir. 1995) (holding that extrajudicial statements made by defense counsel many months before trial were reasonably likely to prejudice the proceedings (quotations omitted)). Crucially, the rules *presume* prejudice to the accused. Local Criminal Rule 23.1(d) provides that the prior criminal record (including arrests or charges), character or reputation of the accused; the existence or contents of any confession, admission, or statement given by the accused; information that is likely to be inadmissible at trial and would create a substantial likelihood of prejudicing an impartial trial; and any opinion as to the accused's guilt are matters that "*presumptively* involve a substantial likelihood" of interference with a fair trial or prejudice to the administration of justice. Local Cr. R. 23.1(d) (emphasis added). DOJ

regulations agree that "[a]ny opinion as to the accused's guilt" is a "type [ ] of information [that] *generally tends to create dangers of prejudice* without serving a significant law enforcement function." 28 C.F.R. § 50.2(b)(6) (emphasis added). So too do "observations about a defendant's character" and "statements, admissions, [or] confessions . . . attributable to a defendant." *Id.* In recognition of the particular prejudice of such information, DOJ regulations specifically prohibit the disclosure of information about a defendant's prior criminal record. *Id.* § 50.2(b)(4). DHS regulations are generally in accord.

The Government's violation of these rules has been so blatant that reference to precedent might be unnecessary. The Government's statements in previous cases that were found problematic by courts are staid and anodyne in comparison to those here. As Judge Caproni noted, "[r]emarks that associate the accused with a long line of convicted criminals or a broader pattern of recognized wrongdoing, however, are of concern specifically because they tend to blur the distinction between legitimate public commentary and improper opinion." *United States v. Silver*, 103 F. Supp. 3d 370, 379 (S.D.N.Y. 2015); *see id.* ("In particular, the Court is troubled by remarks by the U.S. Attorney that appeared to bundle together unproven allegations regarding the Defendant with broader commentary on corruption and a lack of transparency in certain aspects of New York State politics."); *see, e.g.*, *United States v. Watson*, 23 Cr. 82 (EK), 2023 WL 7300618, at *14 (E.D.N.Y. Nov. 6, 2023) (finding Government press release referencing "corrupt executives who flagrantly violate the law" and stating defendant ran a "criminal organization" "presumptively involve[d] a substantial likelihood" of prejudice); *United States v. Smith*, 985 F. Supp. 2d 506, 539 (S.D.N.Y. 2013) (noting "it is hard to find that" U.S. Attorney's statements that case represented an "unappetizing smorgasbord of graft and greed" and a "show me the money" culture of corruption "had any compelling law-enforcement purpose").

Here, the repeated, detailed, vitriolic comments made by the highest officials in our government and law enforcement about the defendants' arrest records, character, presumed guilt, and purported involvement in uncharged crimes are presumptively prejudicial under the rules and substantially threaten the defendants' right to a fair trial.

### C. *Allegations of Purported Gang Involvement Are Particularly Inflammatory and Prejudicial to Defendants' Right to a Fair Trial*

Perhaps the most prejudicial and inflammatory comments made about the defendants have been those leveled most recently by the Secretary of Homeland Security and others in senior law enforcement roles that the defendants were members of, associated with, or involved in the infamous Trinitarios gang. This allegation was the core of the highly publicized January 8, 2026 press conference. After the Secretary of Homeland Security and other senior law enforcement personnel accused the defendants of being members of this "transnational gang," these officials listed numerous other offenses that are much more serious and inflammatory than the charges at issue in this case, that the Trinitarios generally or the defendants specifically have purportedly engaged in, including weapons trafficking, human smuggling, narcotics trafficking, sexual abuse, and other burglaries, robberies, assaults, and weapons offenses.

Local Rule 23.1(d) specifically prohibits the extrajudicial dissemination of information the speaker "knows is likely to be inadmissible at trial and would if disclosed create a substantial likelihood of prejudicing an impartial trial." Local Cr. R. 23.1(d)(6). Evidence of purported gang affiliation is the epitome of such information.

The allegations of gang affiliation are nowhere to be found in the charging documents in this case or the state prosecution. Nor do they form the basis of any charge or element of any count that the defendants face in either case. Because these allegations have no bearing on the charges the defendants face, and thus no probative value, they would be inadmissible.

Courts regularly find that evidence of gang or organized crime affiliation has minimal probative value when, like here, the charged offenses are not gang or organized crime related. *See, e.g.*, *United States v. Rivera*, 13 Cr. 149 (KAM), 2015 WL 1875658, at *13 (E.D.N.Y. Apr. 22, 2015) (finding that evidence of the defendants' alleged racketeering organization's association with the Mafia and the Bloods gang had "little, if any, probative value" because "neither defendant [was] charged with offenses involving the La Cosa Nostra Mafia or the Bloods gang" and the Government did not allege that the defendants had any direct relationship to these groups "in connection with the charged offenses"); *see also United States v. Jackson*, 19 Cr. 356 (ARR), 2021 WL 62109, at *2 (E.D.N.Y. Jan. 7, 2021) (finding minimal probative value of defendant's gang membership because it was "not directly tied to the 'overarching factual scenario' of the case" (quoting *United States v. Molton*, 743 F.3d 479, 482 (7th Cir. 2014)).

The Second Circuit has noted that "there [is] a significant 'possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict.'" *United States v. Nieves*, 58 F.4th 623, 636 (2d Cir. 2023) (quoting *United States v. Irvin*, 87 F.3d 860, 865–66 (7th Cir. 1996) (noting that "guilt by association is a genuine concern whenever gang evidence is admitted")). The effect of such evidence on juries can be profound and lead juries to make determinations not based on the facts, but on improper considerations.

The Second Circuit's holdings are consistent with social science. Published academic studies have confirmed that juries are more likely to be biased against defendants linked to gang activity due to reports in the media of public violence and crime. *See* M. Eisen et al., *Examining the Prejudicial Effects of Gang Evidence on Jurors*, 13 J. FORENSIC PSYCH. PRAC. 1 (2013). These prejudicial outcomes are particularly evident in cases, such as this, in which the

defendants are people of color. *See* E. Maeder et al., *The Combined Effect of Defendant Race and Alleged Gang Affiliation on Mock Juror Decision-Making*, 20 PSYCH., PSYC. & L. 188 (2013).

"The prolific portrayals" of gangs "in the media are likely to 'lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'" *Rivera*, 2015 WL 1875658, at *13 (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). This is true of gangs and gang members generally, but also the Trinitarios specifically because spectacular and violent crimes affiliated with this group are often portrayed sensationally in the media. Indeed, immediately after the January 8, 2026 press conference, the news media and social media began repeating the Secretary of Homeland Security's highly inflammatory accusation.










## II. The Court Should Enter A Special Order Pursuant to Local Rule 23.1 and Convene and Evidentiary Hearing

Despite express Court warnings, applicable Court rules, prior Court orders, and specific departmental regulations regarding extrajudicial statements, the Government's law enforcement

partners have not only failed to conform their conduct to these requirements but have increased the level of wildly impermissible public commentary about the defendants and this pending case. Accordingly, the defense respectfully requests that the Court issue a special order pursuant to Local Rule 23.1(h) and convene an evidentiary hearing to protect defendants' right to a fair trial.

A. *The Court Should Enter A Gag Order*

The Supreme Court has "long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 378 (1979) (collecting cases). To vindicate this constitutional right and "safeguard the due process rights of the accused," trial courts have "an affirmative constitutional duty" to mitigate the effects of pretrial publicity to ensure that a defendant receives a fair trial. *Id.*

These concerns are acute in high-profile cases in which there is a particularly high risk of prejudice from extrajudicial statements and commentary. As Judge Karas cogently summarized, "the Court has an independent obligation to 'avoid the creation of a 'carnival atmosphere' in high-profile cases.'" *Smith*, 985 F. Supp. 2d at 540 (quoting *United States v. Brown*, 218 F.3d 415, 429 (5th Cir. 2000)); *see also id.* at 541 ("[T]he risk of prejudice to the fair administration of justice from a public-relations battle is heightened in high-profile cases."); *United States v. Bulger*, 99 Cr. 10371 (DJC), 2013 WL 3338749, at *6 (D. Mass. July 1, 2013) ("Courts have found that heightened media scrutiny supports the conclusion that attorneys and parties should not make extrajudicial statements.").

In discharging this duty, the Court has the power to proscribe "extrajudicial statements by any lawyer, party, witness, or court official," including law enforcement. *See Sheppard*, 384 U.S. at 361; *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 555 (1976); *Application of Dow Jones & Co.*, 842 F.2d 603, 606, 611 (2d Cir. 1988).

The Second Circuit has held that a gag order on trial participants is justified if the trial court finds that "pretrial publicity . . . posed such a threat to defendants' Sixth Amendment rights as to justify the . . . restraining order," and that no "other available remedies would effectively mitigate [any] prejudicial publicity." *Dow Jones*, 842 F.2d at 610–11. Local Rule 23.1(h) empowers this Court to "issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury." Local Cr. R. 23.1(h). Possible remedial measures include "change of venue, trial postponement, a searching voir dire, emphatic jury instructions, and sequestration of jurors." *Dow Jones*, 842 F.2d at 611.

The requested gag order here is appropriate because the Government and its affiliated agencies have demonstrated flagrant disregard for the Court's rules and repeated orders (in this and other litigation), and absent an order prohibiting further extrajudicial statements, it is apparent that they will continue to share improper, highly prejudicial information that imperils the defendants' right to a fair trial. No other remedies exist at this point in light of the repeated violations of Rule 23.1 by the highest levels of the government and the subsequent breadth and depth of the coverage of the improper extrajudicial commentary. Given the nationwide coverage, no change in venue would remedy the issue (this would also deny the defendants the right to a jury of their peers in the New York City area), and trial delay, voir dire, and jury instructions cannot un-ring the bell of highly prejudicial information once heard by prospective jurors.

Because these statements undoubtedly threaten the defendants' right to a fair trial and no other remedies exist, the Court should exercise its discretion and issue an order prohibiting the parties and affiliated law enforcement agencies and entities (including officials and employees thereof) from making extrajudicial statements regarding this case or these defendants.

B. *The Court Should Order the Government To Remove All Offending Media*

The Court should further order the Government to effectuate the removal of all press releases, media releases, social media posts, and other content on the channels of any law enforcement agency involved in this case that violate Local Criminal Rule 23.1(h). The offending material cited above continues to reside on, *inter alia*, the DHS website and the social media channels of the Secretary of Homeland Security, DHS, CBP, and numerous other officials and entities affiliated with the investigation and prosecution of this case. The ongoing publication of offending material continues to prejudice the defendants every minute it remains up and is accessible to members of the potential jury pool. *See, e.g.*, *United States v. Perryman*, 12 Cr. 123 (ADS), 2013 WL 4039374, at *13 (E.D.N.Y. Aug. 7, 2013) (granting request to direct police department to remove certain prejudicial comments posted to its website).

C. *The Court Should Order an Evidentiary Hearing Regarding the Government's Compliance with Local Rule 23.1 and Judge Wang's Order*

It is clear that the Government and its law enforcement partners have violated and continue to violate Local Rule 23.1 and Magistrate Judge Wang's order and severely imperil defendants' right to a fair trial by making improper and prejudicial extrajudicial statements. What is unknown is whether these violations were made in knowing violation of Local Rule 23.1. If so, further remedies, including the dismissal of this case with prejudice, may be appropriate. The Court should order an evidentiary hearing to pursue this question.

The Court has the inherent authority under its supervisory powers to investigate misconduct and violation of its rules and orders. *See United States v. Williams*, 504 U.S. 36, 46 (1992) (holding that court's "supervisory power" includes authority to "prevent parties from reaping benefit or incurring harm from violations . . . governing matters apart from the trial itself"). Government misconduct includes actions whereby the Government seeks to "obtain[] an

unfair advantage long before the trial even has begun." *United States v. Stein*, 435 F. Supp. 2d 330, 382 (S.D.N.Y. 2006). When such misconduct is suspected, the Court has the authority—indeed, the duty—to investigate. "Most often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist." *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991) (remanding for hearing on claims of outrageous government conduct); *accord United States v. Ventura*, 96 F.4th 496, 502 (2d Cir. 2024). The misconduct here is obvious, but "without a hearing," it will remain "unknown" whether these violations of the Court's rules and orders were the product of a knowing disregard and contempt of the Court's rules and orders. *Cf. United States v. Walters*, 910 F.3d 11, 32 (2d Cir. 2018) (Jacobs, J., concurring).

So that the Court may determine the nature of these violations, it should convene an evidentiary hearing on the Government's compliance with Local Rule 23.1, including, but not limited to, the questions defense counsel posed to Government counsel:

- What steps the United States Attorney's Office took following this case's initiation and Mr. Aybar Berroa's presentment to inform DHS and other law enforcement personnel involved in this prosecution of their obligations under Local Rule 23.1.
- What steps the United States Attorney's Office and the Department of Justice generally have taken in response to the admonishments made by other Judges in this District to law enforcement for extrajudicial statements regarding pending prosecutions in violation of Local Rule 23.1.

Courts in this District faced with similar allegations of Government misconduct have ordered, in the first instance, the Government to provide a sworn declaration from senior officials in the U.S. Attorney's Office or Department of Justice detailing this information. For example, in the pending matter *United States v. Mangione*, 25 Cr. 176 (MMG) (S.D.N.Y.), after the defense identified for the court numerous public statements made by government officials in violation of Local Rule 23.1 and the court's Rule 23.1 admonishment, Judge Garnett ordered the Government to (1) file "a sworn declaration from a person of suitable authority (*i.e.*, at least [the head of the

Criminal Division at the U.S. Attorney's Office] or [the Acting U.S. Attorney], if not an official at Main Justice) that explains to the Court how these violations occurred, despite the Court's [Rule 23.1 Order], and what steps are being taken to ensure that no further violations occur"; (2) "advise the Deputy Attorney General, for dissemination within the Department as appropriate, that future violations may result in sanctions, which could include personal financial penalties, contempt of court findings, or relief specific to the prosecution of this matter"; and (3) "confirm[] that this message has been conveyed to the Deputy Attorney General." Doc. 53 at 2.

The fact that many of the violations of Local Rule 23.1 in this case occurred months *after* Judge Garnett's order in *Mangione*, which the Government swore under oath it provided to the highest levels of the Department of Justice, *see Mangione supra* Doc. 56-1, raises troubling questions about the Government's compliance with the Court's orders and rules. The Court should exercise its supervisory authority and protect the defendants' right to a fair trial by convening a hearing regarding (1) what the Government did to ensure compliance with Local Rule 23.1 and Magistrate Judge Wang's order and (2) how the violations of Local Rule 23.1 occurred in this case despite the Local Rule, Judge Wang's order, and the many admonishments to the Government about compliance with this rule, including Judge Garnett's September 2025 order to the highest levels of the Department of Justice.

## III. Continued or Knowing Violation of the Court's Rules and Orders Warrants Dismissal with Prejudice

A court may dismiss an indictment on "grounds of eliminating prejudice to the defendants . . . or of deterring widespread or continuous official misconduct." *United States v. Fields*, 592 F.2d 638, 648 (2d Cir. 1978). Courts have invoked this authority in appropriate cases where the defendant was denied the right to a fair trial. *See, e.g.*, *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) (affirming dismissal for Sixth Amendment violation); *see Skilling v. United*

*States*, 561 U.S. 358, 379–81 (2010) (discussing cases where convictions were reversed because trial atmosphere was corrupted by press coverage).

Courts have made clear that dismissal is particularly appropriate in the face of a pattern of misconduct. *See, e.g.*, *Fields*, 592 F.2d at 648; *Bank of Nova Scotia v. United States*, 487 U.S. 250, 259 (1988) (contrasting cases involving "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment"); *see also United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) (dismissal may be appropriate "as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature"); *Virgin Islands v. Fahie*, 419 F.3d 249, 258 (3d Cir. 2005) (similar); *Silver*, 103 F. Supp. 3d at 380–81.

The Government and its affiliated law enforcement agencies have been warned in numerous recent cases of their obligations under Local Rule 23.1. *See, e.g.*, *Combs*, *supra* Docs. 50, 63; *Adams*, *supra* Doc. 93; *Mangione*, *supra* Doc. 53. They were specifically warned by Magistrate Judge Wang at Mr. Aybar-Berroa's presentment. Yet they have continued to flagrantly and with increasing invective and vitriol violate this Court's rules and orders. To put an end to this ongoing misconduct—which threatens the defendants' core constitutional fair trial and due process rights—and to deter such misconduct not only in this case but also in others,[34] the Court should investigate how the violations in this case occurred and, if appropriate in light of the factual record, dismiss this prosecution with prejudice. On the current record, the Government's incantations that it understands its obligations under Local Rule 23.1 ring hollow.

---

[34] *See, e.g.*, C. Rose & L. McCarthy, "Judge Scolds Bondi for Publishing Photos of Protesters on Social Media," N.Y. Times (Jan. 28, 2026), https://www.nytimes.com/2026/01/28/us/ice-protest-photos-bondi-social-media.html.

## CONCLUSION

For the foregoing reasons, the Court should enter a special order under Local Criminal Rule 23.1(h) and pursuant to its inherent supervisory authority:

1. Ordering that no person employed by or affiliated with the Department of Justice, Department of Homeland Security, New York City Police Department, or who is in any way involved in the investigation or prosecution of this case, shall make any extrajudicial statement concerning this case that violates Local Criminal Rule 23.1;

2. Directing the Department of Justice, Department of Homeland Security, and all other law enforcement agencies and entities involved in any way in the investigation and prosecution of this case to remove from their websites, media channels, and affiliated social media channels, any and all material that violates Local Rule 23.1, including any content relating to the January 8, 2026 press conference; and

3. Convening an evidentiary hearing regarding the Government's violations of Local Rule 23.1 and Magistrate Judge Wang's order, including what steps the Government took to ensure compliance and how the violations at issue occurred despite numerous prior warnings from other Judges in this District about extrajudicial statements that violate the Local Rules.

Dated: January 29, 2026
New York, New York

Respectfully submitted,

By: /s/ Neil Kelly

Neil P. Kelly
FEDERAL DEFENDERS OF NEW YORK
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700
neil_kelly@fd.org

*Counsel for Christhian Aybar-Berroa*