UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 25 CR 367 (LAP)

MIGUEL FRANCISCO MORA NUNEZ
and CHRISTHIAN AYBAR-BERROA,

Defendants.

------------------------------x Conference

New York, N.Y.
January 28, 2026
10:00 a.m.

Before:

HON. LORETTA A. PRESKA,

District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
MOSTAFA KHAIRY
Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
Attorneys for Defendant Aybar-Berroa
NEIL KELLY

FLORIAN MIEDEL
Attorney for Defendant Mora Nunez

ALSO PRESENT: Erika de los Rios, Interpreter (Spanish)

(Case called)

THE COURT: Is the government ready?

MR. KHAIRY: Good morning, your Honor. Special AUSA Mostafa Khairy for the United States.

THE COURT: Yes, sir. Good morning. Is the defense ready?

MR. MIEDEL: Yes, good morning, your Honor. Florian Miedel for Mr. Mora Nunez.

MR. KELLY: Neil Kelly, Federal Defenders of New York, for Mr. Aybar-Berroa.

THE COURT: How would you like to proceed, counsel?

MR. KHAIRY: Your Honor, there's nothing for the government to raise at this time, given that the defendants still have a pending motion to dismiss, as the Court is aware. That motion is fully briefed. But I understand that the defense does have something to raise to the Court.

THE COURT: Okay. I am going to ask you, counsel, if you want to be heard further on your motion to dismiss. But do you want to raise your other issue first?

MR. KELLY: Yes, your Honor. This is Neil Kelly again. I'm happy to answer questions for the Court on the *Bruen* motion. I otherwise am happy to rest on my papers, but again happy to answer questions.

The second issue I did want to raise for the Court is, I've discussed it this with the government, I've let them know

I'm asking for permission to do this. I would like to move the Court for a special order under Local Rule 23.1(h). That is the local rule about extrajudicial statements and fair trial directives in this district.

What that motion will be addressed to are the continuing press conferences, public statements, releases that the government has been putting out about this case while it has been pending. Those statements in my view are in direct violation of the court's local rules. They're in direct violation of Magistrate Judge Wang's admonishment to the government and the Department of Homeland Security at the presentment for Mr. Aybar-Berroa.

Again, I can get into that in my papers, but I did want to raise for the Court and ask the Court's permission to file that motion later today.

THE COURT: Mr. Khairy, anything on that?

MR. KHAIRY: Yes, your Honor. Just very briefly. Mr. Kelly and I did discuss yesterday his anticipated motion so we are aware of it. Obviously, we take this very seriously. Our obligations under the local rules, we're looking into this at the highest levels at our office.

As I understand it, our office has had discussion about the local rule and compliance with it with all of our federal law enforcement agencies, not just the ones that are part of the prosecution team here in this case, but all of

them. And those conversations are still ongoing as well.

THE COURT: So, should we have counsel go to the trouble of making his motion or do you anticipate a response from the prosecution team or its law enforcement partners?

MR. KHAIRY: I would have to check on that, your Honor. I'm not in a position right now to say whether or not they would in fact respond.

THE COURT: How about this. Would you get back to Mr. Kelly by close of business tomorrow so that -- and you don't have to file it tomorrow, Mr. Kelly, but just so he doesn't waste his time.

Mr. Kelly, you have the permission to file it, but why don't you wait and see if there is a necessity to file it.

MR. KELLY: Understood, your Honor. And as I raised with the government previously, we're asking both for a gag order going forward on extrajudicial statements about this case, but there also is a lot of material I think is in violation of the local rule that is being circulated by the government on its social media channels, its websites, its media availabilities. Part of my anticipated motion is to direct them to take that material down. Again, I'll discuss that with the government, and if they agree to do that, I'll inform the Court and maybe I don't need to file a motion at all.

THE COURT: Whatever you people want.

MR. KHAIRY: That works for the government, thank you.

THE COURT: Thank you.

Mr. Kelly, let me ask you this. With respect to the motion, it seems that the defense has pretty much -- let me just find the right document here -- not dealt with the very explicit language of the Supreme Court in *Bruen*, and rather has relied on the language at page 17 talking about the two steps and whatever.

What are we to make of the explicit language in the case?

MR. KELLY: Thank you, your Honor. And just so I'm answering the Court's question precisely. The language the Court is referring to is the statements about law-abiding citizens?

THE COURT: Yes. And the court goes on and on talking repeatedly in those terms.

MR. KELLY: Sure, your Honor. I guess I would start with the Second Circuit's recent decision in *Zherka*. In that case, the circuit found or assumed before presuming, before proceeding on to the rest of the analysis, that individuals who are not law-abiding citizens, in that case convicted felons, are still part of "the people," and they interpreted that language that the Court is pointing to in *Bruen*, in *Heller*, in *McDonald*, and some of the other Supreme Court cases, as essentially not constricting the definition of "the people" to

law-abiding citizens, but addressing how the people, how their Second Amendment rights are then subsequently regulated.

So I guess to answer the Court's question, I would distinguish between who is among "the people," and I don't think the Supreme Court has narrowly defined that to mean just law-abiding citizens as the government suggests. I think the *Zherka* decision makes that clear.

If the Court wants to analyze how those people's rights are regulated, that's when we get into the history and tradition analysis, but I don't think that language that the Court has pointed to controls the question here.

THE COURT: Does the government wish to be heard?

MR. KHAIRY: Briefly, your Honor. We recognize that the first step which you and Mr. Kelly were just discussing is a very difficult legal question for the Court to answer. While we argue in our brief and we believe that the other circuits, also other circuits outside the Second Circuit have held in our favor that non-citizens do not fall within "the people," we recognize that's still an open question here in the Second Circuit.

But if the Court is inclined to go to the second prong of the *Bruen* analysis, that's where we believe the argument is the strongest, that the nation does have a historical precedent banning or restricting firearm for non-citizens. And one thing I did just want to make the Court aware of, Judge Koeltl

recently issued a decision about two weeks ago in a case called *United States v. Domane Gordon*, docket 25 Cr. 364, I have a copy of the opinion. And he held to that effect. Where he didn't agree with the government's arguments as to the first prong, but did hold that the historical tradition of firearm restriction does limit it to citizens.

THE COURT: Mr. Kelly.

MR. KELLY: I'm sorry.

MR. KHAIRY: I wanted to let the Court know I have a copy of Judge Koeltl's opinion, if you'd like me to pass that up for your convenience.

THE COURT: Yes, sir.

MR. KHAIRY: May I approach?

THE COURT: Yes, sir.

MR. KELLY: I am aware of that opinion. Again, I think Judge Koeltl goes with our argument here on the first step of the analysis of who is among "the people," and that that includes non-citizens without lawful status. That's the analysis under the other amendments in the Bill of Rights, the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment. Obviously we're here as appointed counsel for these gentlemen. They're non-citizens. The Sixth Amendment applies. I think it is the same analysis for who is among "the people."

Where I would disagree with Judge Koeltl's analysis is

once we get into the justifications for burden on the Second Amendment right, I think the Court's analysis in that case finds that this untrustworthiness justification is sufficient. I would just point the Court to the Supreme Court's decision in *Rahimi*, in which the Court found that vague justifications such as unreliable are not sufficient to justify a Second Amendment burden.

I think untrustworthiness is the justification in this case. I think that falls under the same line of analysis as unreliable does under *Rahimi*. So for those reasons, while I am aware of the opinion the government is pointing the Court to, I don't think it controls here.

THE COURT: Okay. Anything else?

MR. KHAIRY: Nothing further from the government, your Honor. We rely on our papers.

THE COURT: Mr. Miedel, did you want to add anything?

MR. MIEDEL: Your Honor, I am fully riding the coattails of Mr. Kelly on this issue.

THE COURT: Yes, sir. Thank you. Okay, counsel.

The government has alleged the following facts, which are presumed to be true for the purpose of resolving defendants' motion to dismiss. *See United States v. Velastegui*, 199 F.3d 590, 592 n. 2 (2d Cir. 1999).

Defendant Christian Aybar-Berroa is a native and citizen of the Dominican Republic with no U.S. citizenship.

(Compl. 13). In 2022, he unlawfully entered the United States, he was served with a notice to appear charging him as a removable alien, he failed to appear at his immigration proceedings, and an immigration judge ordered him removed in absentia in 2023. (Compl. 13). He thereafter unlawfully remained in the United States.

Defendant Miguel Francisco Mora Nunez is also a native and citizen of the Dominican Republic who has never been a U.S. citizen. (Compl. 11). In 2023, he unlawfully entered the United States, he was served with a notice to appear charging him as a removable alien, he failed to appear at his immigration proceedings, and an immigration judge ordered him removed in absentia in 2024. (Compl. 11.) He thereafter unlawfully remained in the United States.

The government has alleged that on or about July 19, 2025, Defendant Mora Nunez, shot an off-duty Customs and Border Patrol Officer ("Victim-1") in Manhattan, New York. The bullet Mora Nunez fired struck Victim-1 in the face and right arm. Victim-1 then appeared to return fire, hitting Mora Nunez twice, before Mora Nunez fled on a motorbike, which defendant Aybar-Berroa drove.

Defendant Aybar-Berroa assisted defendant Mora Nunez in fleeing the scene on the motorbike, and then drove Mora Nunez to a hospital. Thereafter, Aybar-Berroa alerted others that he and Mora Nunez had been involved in a shootout, and

Aybar-Berroa delivered the clothes he was wearing to one of Mora Nunez's relatives in exchange for different clothes. Aybar-Berroa later admitted that he gave Mora Nunez's relative his clothing from the shooting because it was bloody, and they needed to get rid of his bloody clothes. (Compl. 4(e)).

In November 2025, in a superseding indictment, a grand jury charged:

(1) Mora Nunez with one count of possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5)

(2) Aybar-Berroa with one count of accessory after the fact to possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 3, and

(3) Aybar-Berroa with one count of possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5).

In December 2025, the defendants moved to dismiss the superseding indictment pursuant to the Second Amendment of the United States Constitution, Federal Rule of Criminal Procedure 12(b), and the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). Defendants argue that the Second Amendment's plain text covers the charged conduct and that 18 U.S.C. § 922(g)(5)(A) is unconstitutional under *Bruen*. (See dkt. nos. 25, 26, 28, 29.)

The government opposes, arguing that defendants, as

undocumented immigrants, or illegal aliens, who have been ordered removed, are not protected by the Second Amendment, and even if they were, Section 922(g)(5)(A) is not unconstitutional because it is consistent with this nation's tradition of firearms regulation. (See dkt. no. 27.) Having considered the parties' briefs and oral argument on the matter, the Court is prepared to rule on the motion.

The Second Amendment provides that "the right of the people to keep and bear arms, shall not be infringed."

18, United States Code, Section 922(g)(5) prohibits "an alien ... illegally or unlawfully in the United States" from "possess[ing] ... any firearm or ammunition" in or affecting commerce.

As the Court of Appeals recently explained, under *Bruen*, the Supreme Court articulated a two-step framework to evaluate Second Amendment challenges. First, [the Court] must ask whether the Second Amendment's plain text covers an individual's conduct. If it does not, the constitutional inquiry ends, and [the] challenge to the law fails.

If the individual's conduct is covered, then the Constitution presumptively protects that conduct, and the government must then justify its regulation by demonstrating that it is consistent with the nation's historical tradition of firearm regulation.

*Giambalvo v. Suffolk Cnty., New York*, 155 F.4th 163,

176-77 (2d Cir. 2025).

Therefore, the threshold question is whether the Second Amendment's plain text covers the defendants' conduct. Put differently, are the defendants, who are presumed for the purpose of this motion to be illegal aliens, among "the people" protected by the Second Amendment?

The Supreme Court's language in *D.C. v. Heller* provides guidance as to the meaning of the term "the people" in the Second Amendment. For example, the Supreme Court held that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635 (emphasis added). The Court also observed that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," *Id.* at 580 (emphasis added), and that "[w]e start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

This Court finds that under the plain text of the Second Amendment, illegal aliens are, per se, not "law-abiding, responsible citizens" or "members of the political community."

Indeed, as Judge Steven Menashi observed in concurrence in *United States v. Perez*:

That illegal aliens remain outside the political

community is reflected throughout the Constitution and federal law. Illegal aliens may not hold federal elective office, are barred from voting in federal elections, may not serve on federal juries, and are subject to removal from the United States at any time. Accordingly, illegal aliens are not "members of the political community" -- that is, "the people" -- who may invoke the Second Amendment.

6 F.4th 448, 463 (2d Cir. 2021) (Menashi, J. concurring) (citations omitted).

Although the United States Court of Appeals for the Second Circuit has not definitively resolved this question, this Court notes that multiple Courts of Appeals have held that the Second Amendment does not apply to illegal aliens. *See United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection."); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam) ("[T]he protections of the Second Amendment do not extend to aliens illegally present in this country."); and *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States.").

For these reasons, the Court holds that the Second

Amendment's plain text does not cover the defendants' individual conduct as charged pursuant to 18 U.S.C. 922(g)(5) and thus the constitutional inquiry ends.

Nevertheless, assuming that the Second Amendment does protect illegal aliens, the Court alternatively holds that the government has met its burden in justifying that Section 922(g)(5) is consistent with the nation's historical tradition of firearm regulation.

As the government has demonstrated here today, and as Judge Menashi's concurrence in *Perez* observes, the historical record shows a consistent practice, before, during, and after the American Revolution, of disarming people whom individuals viewed as outside the political community.

For example, under colonial-era statutes, Massachusetts and Virginia barred Native Americans from possessing arms, and Virginia also prohibited Catholics from possessing arms unless they swore loyalty to the "Hanoverian dynasty and to the Protestant succession."

Furthermore, colonial governments disarmed individuals who refused to swear allegiance to the state or the United States. Moreover, during ratification, New Hampshire proposed that Congress be forbidden from disarming citizens except those engaged in actual rebellion, and Massachusetts delegates urged similar protections for "peaceable citizens."

Thus, the Court alternatively finds that the

government has met its burden in demonstrating that Section 922(g)(5) is consistent with the nation's historical tradition of firearm regulation.

Accordingly, the Court denies defendants' motions to dismiss the indictment.

How do you want to proceed next, friends?

MR. KELLY: Your Honor, may we confer briefly?

THE COURT: Yes, of course. Thank you, gents.

(Counsel conferring)

MR. KHAIRY: Your Honor, the parties have conferred. We'd ask that the Court set a trial date, May or beginning of June, if the Court is available.

THE COURT: This won't take any more than a week, right, gents?

MR. KELLY: I don't think so.

MR. KHAIRY: The government expects it to be about a week.

MR. MIEDEL: Just to clarify, we expect there will be a resolution in this case before trial. But I don't have an objection to setting a trial date. I do have a three-week long trial starting on May 11. So, if it's going to be in that time period, it would have to be middle or end of June.

THE COURT: Yes, sir. Thank you.

THE DEPUTY CLERK: June 29.

MR. KELLY: That works. Thank you.

MR. MIEDEL: That's fine.

MR. KHAIRY: Thank you, your Honor.

THE COURT: Thank you. And gents, may I please have your requested voir dire questions and your request to charge the week before. I'll ask you to exchange requests to charge starting with the government sending its requests to the defendants in adequate time for the defendants to review it, and let me know if there are any modifications by one week before the trial date. In other words, I don't want to read through different requests to charge and compare the commas.

MR. KHAIRY: Understood, your Honor.

THE COURT: Is there anything else today?

MR. KHAIRY: Yes, your Honor. The government respectfully requests that the Court exclude time until the trial date.

THE COURT: Is there any objection, counsel?

MR. KELLY: Not for me.

MR. MIEDEL: No objection.

THE COURT: In order to permit counsel to prepare for trial, and to discussions toward a resolution, time between today and June 29 is excluded from calculation under the Speedy Trial Act in the interest of justice.

Anything else, gents?

MR. KHAIRY: Nothing further from the government. Thank you.

MR. MIEDEL: No, your Honor. Thank you.

MR. KELLY: No. Thank you.

THE COURT: Thank you, friends. Good morning. Stay warm.

(Adjourned)